FELTMAN, Respondent, v. DUNN, Appellant.

(217 N. W. 198.)

(File No. 5399.  Opinion filed December 28, 1927.)

*T. J. Spangler,* of Mitchell, for Appellant.
*Brown & Brown,* of Chamberlain, for Respondent.

POLLEY, J. This action is brought to recover damages for alleged malpractice. The defendant is a physician and surgeon practicing his profession at Chamberlain. In an accident that occurred at plaintiff's home some 10 or 12 miles from Chamberlain, on the 26th day of April, 1921, plaintiff broke both her arms just above the wrist joints, and broke both the bones of one leg just at the ankle joint. She sent word to defendant to come out and attend to her injuries. Defendant took a trained nurse from the hospital at Chamberlain and went out to plaintiff's home. When he arrived and saw the nature and extent of plaintiff's injuries, he decided that she could not be properly cared for in the

country, so, after placing temporary bandages on her injuries, he put her in his car and took her back to Chamberlain, first to his office, where he made X-ray pictures of her various fractures, then to the hospital where an anesthetic was administered and the fractures reduced. Temporary splints were put on the fractures and plaintiff remained in a room in the hospital until the 3d day of May, when, the swelling having sufficiently subsided, she was taken back to defendant's office; the splints were removed, and the fractures were again X-rayed. These X-rays showed the broken bones to be in proper apposition. The splints were replaced, plaintiff was taken back to the hospital and put under the influence of an anesthetic, and the broken ankle was put in a plaster cast. Almost immediately after recovering from the anesthetic, and repeatedly for the next two days, plaintiff requested that she be taken home. Defendant explained to her that she could not receive the proper treatment at home and insisted that she remain at the hospital where she could have the care of competent nurses, and where he could give the proper attention to her injuries. Plaintiff disregarded defendant's advice and on the 5th day of May, two days after the cast was put on her leg, plaintiff's husband, with his father and plaintiff's mother, and perhaps other members of the family, came to the hospital during the absence of the defendant and, without his knowledge or consent, took plaintiff to the home of her father-in-law. No word or any instructions were left for the defendant, and he did not know she was gone until about 5 o'clock that evening when he went to her room to make his regular call. There is nothing in the record to show that defendant heard or knew anything more from plaintiff until about the 26th day of May. When she left the hospital, her arms were in metal splints. About the 26th day of May plaintiff's husband went to defendant and asked if he could take the splints off her arms. Defendant told him, "Yes," and he went home and took them off, and on the 29th day of May plaintiff's husband brought her back to the hospital in Chamberlain and had defendant remove the cast from her leg.

When the cast was removed, it was found that the ends of the broken bone had slipped out of place so that less than half of the surface of the ends of the broken bones were in contact with each other, and the lower end of the bone and foot were bent over

sidewise. The ends of the bone where they came in contact had knit together so that they could not be put back into proper position without breaking them apart and again reducing the fracture. This left a most unsatisfactory condition. The evidence shows that at the point of the fracture the leg was crooked and weak and lame and very painful. Medical experts testified that the proper remedy for the then existing condition was what they termed an open operation; that is, cut in to the bone, then rebreak it, cut away the bony substance that had formed around the fracture, put the broken ends of the bone back into place, and wire them together. They testified that this is a well known and practicable operation and one in common use, but said that this should not be done until six or eight months later. Plaintiff expressed no desire to have this done, but commenced this action against defendant for $10,000 for improper treatment of her injuries.

In her complaint plaintiff alleges damages for negligent and unskillful treatment of her leg and one wrist, but at the trial she abandoned her claim for injury to her wrist. As to her leg she alleged:

"That in attempting to set the broken bones of the leg of said Bessie Feltman, the defendant was negligent and unskillful and failed to set the ends of said fractured bones so that the same would meet and unite properly, and as a result of said unskillfulness and negligence in the treatment of the said fractured bones the said Bessie Feltman's leg is permanently crooked and weak and will not sustain her weight as it would, had the said fracture been properly treated, and the said Bessie Feltman is permanently lame and suffers continual pain both in body and mind as a result of such negligent and unskillful treatment."

In support of this allegation of the plaintiff and to show that the bones were not in place when the cast was put on, she and her husband and other of her relatives testified that the leg was crooked when the cast was put on, that it looked just as crooked to them then as it did after the cast was taken off, and that they called the attention of the defendant to this condition when the cast was put on. Defendant testified that when the cast was put on the ends of the bone were just as he had placed them on the 26th day of April when he reduced the fracture, and to substantiate this testimony he introduced two X-ray pictures, one a side

view and the other a front view, of plaintiff's ankle taken at the time the cast was put on. These two X-rays are in the record, and they both show that at that time the ends of the broken bone were in proper position. To use a medical phrase, they were in "perfect apposition." Up to that time, at least, there had been no negligence or lack of skill on the part of the defendant. And there is no evidence to indicate, and no claim is made, that anything was done or omitted by the defendant or any one else while she was in the hospital to bring about the condition of the fracture that was shown to exist when the cast was removed, so that plaintiff wholly failed to prove her allegation that, in attempting to set the broken bones of the leg, the defendant was negligent and unskillful and failed to set the ends of the fractured bones so that the same would meet and unite properly, and also failed to show any unskillfulness or negligence in his treatment of her injuries while she remained in the hospital. But, says counsel for plaintiff, defendant knew at 5 o'clock in the afternoon of the day plaintiff left the hospital that she had gone home. He knew that this going home was likely to have displaced the bones. The medical experts testified that her going home in the manner she did was likely to displace the bones at the fracture.

The evidence shows that plaintiff's husband and his father and plaintiff's mother came to the hospital at about 3 o'clock on the afternoon of May 5th, two days after the cast had been placed on her leg. Her husband picked her up bodily by placing one arm under her back and the other arm under her thighs and laid her on a wheel chair, took her down to the street, where he picked her up again and placed her crosswise in the rear seat of an automobile, and then drove her out to the home of her father-in-law, a distance of some 10 to 12 miles, at the rate of 14 or 15 miles an hour. Of course, such handling would be likely to displace the bones at the fracture, but defendant was not responsible for her removal. He did not remove her nor direct that she be removed. There was some contention at the trial that defendant did consent to her going home, but there was no competent evidence in support of such evidence. Plaintiff and her mother, while on the witness stand, said that one of the nurses said that defendant said that plaintiff might go home. But defendant denied that he said anything of the kind and said nurse was not put on the stand to tell

what she heard defendant say. But two of the nurses at the hospital testified to a conversation that took place between plaintiff and defendant on the morning of the day on which she left the hospital, in which defendant told plaintiff not to go home and told her particularly that he wanted to watch her ankle and make a fluoroscopic examination of it, and told her that she had a very difficult fracture and that she would not obtain the best results if she went home. Plaintiff denied having had this conversation, but neither the plaintiff nor any other witness in the case testified that the defendant ever told plaintiff that she might leave the hospital or consented to her leaving. She had no understanding with defendant that he should attend her case after she left the hospital. She did not ask him to come to see her, and she did not expect he would come. Moreover, it is perfectly plain that when she left the hospital she thought she did not need the further services of the defendant, and that her mother-in-law could take just as good care of her as the nurses at the hospital.

At the close of plaintiff's testimony, and again at the close of all the testimony, defendant moved for a directed verdict, on the ground, among others, that the evidence was insufficient to support a verdict for plaintiff. This motion should have been granted.

In Dean v. Seeman, 42 S. D. 577, 176 N. W. 649, this court adopted, and has since followed, what we believe to be the universal rule in such cases, that:

"The mere fact that the broken bone did not stay in place after it had been set and did not grow together in the usual length of time does not necessarily prove, nor even imply, that appellant was negligent or unskillful. Physicians and surgeons are not to be held responsible for results, but only for the kind of service rendered by them." Warwick v. Bliss, 46 S. D. 662, 195 N. W. 501; Hanson v. Harris, 44 S. D. 457, 184 N. W. 262.

In order to hold a physician or surgeon liable for damages in this class of cases, it is necessary to show that the condition complained of must have resulted from the negligent or unskillful conduct of himself or of others acting under his direction.

In this case the evidence shows that the fracture of plaintiff's ankle was properly reduced on the 26th day of April. The X-ray pictures that were taken when the splint was removed on the 3d

day of May prove beyond any doubt that the bones were in proper position at that time. Whether it was possible that the bones became displaced while defendant was putting on the plaster cast we do not know, and it is not necessary to decide. There is no evidence tending to prove that anything of the kind did happen either then or while plaintiff remained in the hospital. The evidence does tend to show, however, that it was not only possible but highly probable that the displacement of the fractured bones was caused by the manner in which plaintiff was handled when she was removed from the hospital, but this was not done by defendant, nor under his direction, and he is not liable for anything that happened after plaintiff left the hospital.

There is testimony in the record tending to show what was said and done by defendant after the cast was removed from plaintiff's leg.

Nothing that was said or done by defendant after the removal of the cast is at all material to the case. Plaintiff's entire case is based on the fact that the bones of her ankle had been displaced at the fracture and had grown together in such manner as to leave her ankle weak and crooked and painful, but the evidence fails to show that defendant was responsible for this condition and plaintiff is not entitled to recover. Defendant's motion for a directed verdict should have been granted and the action dismissed.

The judgment and order appealed from are reversed.

SHERWOOD and BURCH, JJ., concur.

CAMPBELL, P. J., concurs in result.

BROWN, J., disqualified, and not sitting.