CAMPBELL, Respondent v. CITY OF CHAMBERLAIN

et al., Appellants

(100 N.W.2d 707)

(File No. 9796. Opinion filed January 19, 1960)

■

**Kirby, McDonnell & Kirby, Tom Kirby, Jr.,** Sioux Falls, for Appellants.

**M. Q. Sharpe, John W. Larson,** Kennebec, for Respondent.

SMITH, J. Occlusion of a coronary artery caused the death involved in this workmen's compensation case. The circuit court, on appeal, concluded it was unreasonable for the Industrial Commissioner to find "that the decedent's work in no manner contributed to decedent's death, under the provisions of the workmen's compensation law". Whether the circuit court erred in so concluding is the principal question presented on this appeal by the employer and its insurance carrier.

A compensable injury is defined by SDC 64.0102(4) as "* * * only injury by accident arising out of and in the course of the employment, and shall not include a disease in any form except as it shall result from the injury".

As pointed out in Johnson v. Concrete Materials Co., 70 S.D. 95, 15 N.W.2d 4, the legislature, by re-enacting the foregoing definition in the Revised Code of 1939, is presumed to have approved the previous holdings of this court in Johnson v. La Bolt Oil Co., 62 S.D. 391, 252 N.W. 869 and Meyer v. Roettele, 64 S.D. 36, 264 N.W. 191. In Johnson v. La Bolt Oil Co., [62 S.D. 391, 252 N.W. 871] it was held "* * * it is sufficient that the injury itself is unexpected, and that it is not necessary that the cause of the injury should be untoward and unexpected, occurring without design." In Meyer v. Roettele it was written, "We are of the view that a disease may be an 'injury by accident' within the meaning of our statute. The exclusion is of any disease which is not an accidental injury or which does not result from such injury. It is generally recognized that accident as contemplated by the Workmen's Compensation Law is distinguished from so-called occupational diseases which are the natural and reasonably to be expected result of workmen following certain occupations for a considerable period of time. On the other hand, if the element of sudden-

ness or precipitancy is present and the disease is not the ordinary or reasonably to be anticipated result of pursuing an occupation, it may be regarded as an injury by accident and compensable. * * * The inception of the disease under the evidence in the instant case is attributable to the unexpected and undesigned occurrence of the presence of the poisonous toxin and is assignable to a definite time, place, and circumstance." [64 S.D. 36, 264 N.W.194.]

 These principles are not without application because the injury suffered is but an aggravation of a preexisting disease or condition. Elmstrand v. G & G Rug & Furniture Co., 77 S.D. 152, 87 N.W.2d 606. However, as indicated by Meyer v. Roettele, supra, it is now settled that the disease, or the aggravation of an existing disease or condition must be assignable to a definite time, place and circumstance. Tennis v. City of Sturgis, 75 S.D. 17, 58 N.W.2d 301 and Elmstrand v. G & G Rug & Furniture Co., supra.

The employer introduced no evidence. We outline the evidence introduced by the claimant.

At the time of his death, Arley Campbell was 70 years of age. In life he was a small, energetic, active individual, weighing about 135 pounds and standing 5 ft. 6 in. For many years he had been superintendent of the water and sewage department of the employer, the City of Chamberlain. As such he had charge of all of the water and sewage systems, and made installations and repairs therein. His crew consisted of several men. Although he did some office work, it was his practice to join his men in doing more or less hard manual labor.

In October 1951 Campbell suffered a coronary thrombosis and was hospitalized for two weeks by their family physician. In January 1952 he complained to that physician of recurrent anginal pain on exertion and glycerine tablets were prescribed. Although he was seen during subsequent years by his physician in connection with other described unrelated ailments, no further complaints were made of trouble with his heart and no additional treatment was given or prescribed. Those closely associated with him

at home or in daily work could not recall his complaining of not feeling well or of his taking time off because of illness.

It was his custom to precede his men at work in the mornings, at which time he would operate the pumps which forced accumulated sewage to the treatment plant. On Thursday, November 1, 1956, he reported for work as usual, in apparent good health. He and his crew were then engaged in running some new water and sewer lines. For some portion of that day Campbell operated the digger machine. In midafternoon water was dicovered gushing up from a break in the principal twelve-inch main in the heart of the business district. Because of its size, function and location, the break created a very serious emergent situation. By the time valves were closed and machinery moved, it was about six o'clock before the actual work of excavation and repair was under way. It was then freezing cold and a thirty-mile wind was blowing sleet and rain. A thirty-foot trench, six feet deep and six feet wide was sunk through the hard surfaced street. The work was hampered by water which continued to flown into the trench. To make the repair it was necessary to thoroughly remove the rust with a large rattail file, and then to bolt a cumbersome 75-lb. copper sleeve and rubber gasket around the main. Because of his long experience and greater skill, Campbell made the repair with the help of others. To do so, he worked in the ditch in water to his knees for two hours. In addition he had worked with his men in excavating the main. It was about one o'clock a.m. when the repair was completed. Thereafter the men departed but Campbell went to the water plant and operated the pumps for a time. He arrived home about two a.m.

Mrs. Campbell testified that he left home Thursday morning before seven; he was home about an hour at noon; and she next saw him when he came home at two a.m. She let him in and helped him remove his wet clothing. He was wet to the skin above his knees. He looked tired or sick. He was pale as a ghost and his eyes were white. He complained, "Help me get to bed, I'm froze" and "I'm just so cold I can't move." She stayed up and used heating

250

pads in an attempt to warm him as he slept by spells. At six a.m. patrons began to call because they were without water. After having coffee he left the house at 8:30. He was home for two hours at noon and came home for the day at about five o'clock. He put in about the same kind of a day on Saturday, and about two hours on Sunday. On Monday he went to work as usual, and she didn't see him alive again. During the time he was at home during those days he was pale, his eyes did not appear normal—she described them as "white" or "glassy"—he was cold to the touch and complained he could not get warm. She said, "I thought from the way he walked and stooping and held his hands on his abdomen all the time that he was in pain, but he wouldn't admit it. That is, he would say he was better and 'don't worry, I am all right as soon as I get warm.'" At another point on cross-examination she said, "he said 'the pain is moving to here. I'll be all right as soon as I get warm,' and that's all the answer I could get out of him, and he wouldn't complain." She said he did not look feverish; she expressed the opinion that he did not have a cold, but continued to complain he could not get warm.

John Graves, who worked under Campbell and had assisted in the work of Thursday, was the only workman to report Friday morning. He described Campbell's work on Friday and Saturday as that of helping around the ditch—(which was not closed until Saturday)—as pushing some dirt around with the tractor. When asked about Campbell's appearance on Friday he said, "* * * he looked natural that Friday yet except just the idea he was catching a cold." Asked about his appearance on Saturday, he said, "I just can't remember that far back, but I know he was complaining about catching an awful cold in that ditch there that night before." He saw him Monday morning at a restaurant where the crew frequently met. Graves said, "He said he was catching a cold, yes; and he most generally drinks about two cups of coffee at a restaurant, and that morning he didn't only drink one—not even that. He drank half a cup and left it sitting there." He thought he appeared feverish that morning. When asked how he formed that

opinion, he said, "You can generally tell that on a fellow that's coming down with a bad cold or something."

Another witness who worked with Campbell testified that he was pale on Friday and complained of being cold, and seemed more pale on Monday. He also testified that his movements had slowed up.

On Monday morning about ten o'clock Campbell had assisted in loading a 150-lb. pressure pump into a truck and had gone into his office. Then minutes later he was found in his desk chair gasping for breath. He was taken to the hospital where he was examined by his family physician. He was unconscious, almost pulseless, and his heart was palpitating. He expired during the examination. No autopsy was performed. The physician signed a death certificate giving coronary occlusion as the cause of death.

As a witness at the hearing before the commissioner the family physician was examined at length on direct and cross-examination with reference to facts revealed by his treatment and examination of Campbell, and as an expert predicated upon assumed facts. He expressed the opinion, based upon Campbell's age and medical history, that arteriosclerosis did exist. During a cross-examination dealing specifically with the patient Campbell, these crucial questions and answers appear:

"Q. Now, Doctor, this man could have died in his bed, could he not? A. Yes.

"Q. Do you know whether or not the work he was doing is the cause of his death? A. Well, when you speak of a cause, of course you must differentiate between primary and precipitating or contributing cause. Which do you refer to?

"Q. Any. * * * A. I'm going to get everyone confused, I'm afraid. I think it's generally held medically that any patient who has suffered from a coronary thrombosis for any given time in his life, exertion is definitely an incompatible factor with his wellbeing, and has been shown, experimentally

as well as actually, from the literature, as being definitely an aggravation.

"Q. Well, Doctor, I would rather know of your own knowledge rather than literature. A. I realize I left myself wide open there. I'm merely trying to restate what I have just said. It's my own personal opinion that Arley Campbell's condition was definitely aggravated by excessive physical exertion under inclement conditions.

"Q. Now, is it your opinion that this condition caused his death at a period three to four days later? A. Yes.

"Q. Now, to get back to the question again, what caused the death. In other words, Doctor, couldn't his death have been caused by some physical factor in his body? * * *

"Q. Not connected with his employment in any way? * * * A. One would be forced to answer that question affirmatively due to the fact of no autopsy findings. * * *

"Q. And in the face of no autopsy, it would be pretty difficult to pin down the exact cause of death, wouldn't it? By that I mean what caused his heart attack? A. Yes.

"Q. And therefore on the basis of what we actually know, we have to assume certain things, don't we? A. Yes.

"Q. And those things which we are assuming are material to the findings you have made, aren't they? A. Yes."

In Edge v. City of Pierre, 59 S.D. 193, 239 N.W. 191, 194, after holding the burden of proof to be on the complainant, it was written:

"* * * on an appeal from a decision of the industrial commissioner, the circuit court sits as a reviewing court only upon the record made before the commissioner. The trial forum for as-

certaining material facts is the * * * industrial commissioner * * * and facts so found must be accepted by the reviewing court, unless so palpably erroneous upon the record as to be unreasonable; such findings standing substantially upon the same plane as the verdict of a jury. * * *"

And it was there further clearly pointed out,

"It is therefore more accurate in cases where findings, regardless of their form, are adverse to the party having the burden of proof to say that such findings cannot be disturbed on appeal, excepting only where it appears upon the record that the party having the burden of affirmatively proving the existence of material facts has established the existence thereof by such a clear preponderance of the evidence that it was unreasonable for the trier of the facts to fail affirmatively to find such existence. * * *"

And see James v. McDonald, 73 S.D. 78, 39 N.W.2d 478.

We are not required to speculate as to the reasoning of the able Industrial Commissioner. His views are set forth in a letter to counsel which appears in the settled record. It is fair to say that although he accepted the fact that the work of Thursday involved unusual and extreme exertion, because collapse did not come until Monday, and Campbell had continued to work as usual in the meantime with no complaint except that of being cold and catching cold, and appeared to Graves in pretty good shape, he was thereby precluded from finding that the described over-exertion contributed to the death. We share the view of the circuit court that, on this record, the commissioner's view is palpably unreasonable.

The record is without significant conflict. Although Campbell had previously suffered a coronary thrombosis, and hence had an impaired heart, he had made no complaint with reference to it to his family physician, his wife or to his associates for several years, and had lost no time from his work because of any illness during

that time. On Thursday, November 1, 1956, he reported to work in normal good health. As the result of an emergency requiring extreme and extended exertion under very inclement circumstances, he returned home at two a.m. Friday exhausted, soaking wet, and thoroughly chilled. Very properly the commissioner received and considered the evidence of laymen of the natural and spontaneous expressions of suffering of Campbell made in their presence. Sanders v. Reister, 1 Dak. 151(145), 46 N.W. 680; Bordwell v. Mission Hill Township, 40 S.D. 78, 166 N.W. 229; VI Wigmore, Evidence, § 1719; and McCormick, Evidence, § 265. His constant complaint to his wife from the time he arrived home at two a.m. Friday until his death was of being unable to get warm, and she said he felt cold to the touch. To others his complaint from the outset, including Monday was that he was "catching" an awful cold. His wife saw no evidence of a cold, and the witness Graves had no clear memory but could tell he had a fever on Monday because "you can generally tell that on a fellow that's coming down with a bad cold or something." To his brother-in-law he complained both of being cold and catching cold and appeared increasingly pale. On Monday just after assisting in lifting a 150-lb. load into a truck he collapsed and shortly expired .The single inference to be drawn from this testimony is that he suffered a disorder or indisposition definitely assignable to the extreme exertion and exposure of Thursday which left him with a feeling of being cold right up to the time of his collapse.

■■ Without an autopsy, and as suggested by the family physician, even with an autopsy, it could not be demonstrated with absolute certainty that the extreme experience of Thursday contributed to the death on Monday. A finding that it did so contribute must rest on the testimony of professionals because the field is one in which laymen are not qualified by learning, or experience, to express an opinion.Lohr v. Watson, 68 S.D. 298, 2 N.W.2d 6; VII Wigmore, Evidence § 2090. As a basis for such a finding plaintiff offered the opinion of the family physician that the Thursday exertion aggravated Campbell's impaired condition and contributed to his collapse. We appreciate that

notwithstanding the expression of that opinion by one well qualified, the responsibility of decision remained with the commissioner. Circumstances may justify the trier of the fact in disregarding expert opinion. 22 C.J. Evidence § 823 at p. 729; 32 C.J.S. Evidence § 567. However, we do not believe the uncontradicted and undiscredited testimony of an expert dealing with a scientific issue should be arbitrarily disregarded. Cf. Burton v. Neill, 140 Iowa 141, 118 N.W. 302, 17 Ann. Cas. 532; Axford v. Gaines, 50 N.D. 341, 195 N.W. 555, and Jerke v. Delmont State Bank, 54 S.D. 446, 223 N.W. 585, 72 A.L.R. 7. In view of the factual background we have just recited, and his testimony that it is generally accepted that exertion is incompatible with the well-being of a patient with Campbell's medical history, we think, upon this record, the uncontradicted ultimate opinion of the doctor that the extreme exertion on Thursday contributed to the collapse on Monday should not be disregarded.

As we have indicated, looking to the whole record, we are of the opinion that it was unreasonable for the commissioner to find that the decedent's work in no manner contributed to his death.

The judgment of the circuit court is affirmed.

All the Judges concur.