OVIATT, Respondent v. OVIATT DAIRY, INC., Appellants

(119 N.W.2d 649)

(File No. 10007. Opinion filed February 15, 1963)

---

**Davenport, Evans, Hurwitz & Smith,** Sioux Falls, for Employer-Insurer and Appellants.

**Loucks, Oviatt & Bradshaw,** Watertown, **Royhl, Benson & Beach,** Huron, for Claimant and Respondent.

HOMEYER, J. This is a Workmen's Compensation case. Margaret M. Oviatt, widow of Max D. Oviatt, claims death benefits. The Industrial Commissioner denied an award. The circuit court reversed the commissioner and directed the entry of an award of compensation. The employer-insurer appeal.

By proper assignments the single question for review is whether or not the decision of the industrial commissioner is reasonable and supported by credible evidence. Both sides recognize that if the findings of fact of the commissioner are supported by substantial, credible, and reasonable evidence, then such findings must be sustained. Edge v. City of Pierre, 59 S.D. 193, 239 N.W. 191; Lang v. Jordan Stone Co., 61 S.D. 330, 249 N.W. 314; Wieber v. England, 52 S.D. 72, 216 N.W. 850.

It is settled law in this state that disease, or the aggravation of an existing disease, is compensable, but that such disease or aggravation must be assignable to a definite time, place and circumstance, Tennis v. City of Sturgis, 75 S.D. 17, 58 N.W.2d 301, and that the disease, or aggravation of such disease, must result from unusual exertion. Hanzlik v. Interstate Power Co., 67 S.D. 128, 298 N.W. 589; Campbell v. City of Chamberlain, 78 S.D. 245, 100 N.W.2d 707.

A recognized purpose of the Workmen's Compensation Law is to transfer from the worker to the employer, and ultimately to the public, a greater portion of the economic loss due to industrial accidents and injuries and is remedial in character and entitled to a liberal construction. Meyer v. Roettele, 64 S.D. 36, 264 N.W. 191; Schwan v. Premack, 70 S.D. 371, 17 N.W.2d 911; Bergren v. S. E. Gustafson Construction Co., 75 S.D. 497, 68 N.W.2d 477.

With these basic principles in mind, we examine the evidence presented to the commissioner.

Max D. Oviatt was 36 years of age at the time of his death, married and the father of five minor children. He was employed by Oviatt Dairy, Inc., in a managerial and supervisory capacity and spent most of his time promoting sales. During the week prior to his death, which occurred on January 18, 1959 (Sunday) he spent the first three days at Aberdeen at his usual duties returning to Huron, the base of operations, on Wednesday evening, January 14. About 10:30 p. m. that evening he received a telephone call that one of his route men at Aberdeen had an emergency appendectomy. Oviatt got up about 4 a. m. Thursday, drove to Aberdeen, and took over the route for Thursday and Fri-

day. He was assisted by Mrs. Bacon, wife of the route man, who had lived at Aberdeen most of her life and had some familiarity with streets and addresses, but who had never been over the route before.

The milk truck had been loaded the night before and Oviatt and Mrs. Bacon started on the route about 7:30 a. m. The temperature was between six above and five below zero that day and the wind velocity 15 to 20 miles per hour. The ground and walks were icy and slippery, covered by a small quantity of snow. The route covered an area where college students and others lived in a trailer court and in huts and was poorly marked. Some customers lived in second and third floor apartments. There were about 135 customers on the Thursday route. Deliveries consisted of dairy products in various amounts to the different customers, with the largest being one-half gallons, and the carrier load having a maximum weight of about 60 to 65 pounds, depending on what was in the load. Because of unfamiliarity with the route and the demands of the customers, many extra trips were necessary. The normal time spent on a route was about 5 hours. Oviatt covered the route in about 10 hours. Virtually all deliveries were made by him with a few being made by Mrs. Bacon. After completion of the route on Thursday Oviatt did the necessary bookwork on the operation and with the help of another man unloaded the empty cases, and reloaded the truck for the next day's operation.

Mrs. Bacon testified that Oviatt was jovial and full of energy when they started, but as the day progressed he tired, became quiet and was exhausted at the end of the day's work. He had difficulty opening the truck door. Oviatt called on Darrel Bacon at the hospital Thursday night and Bacon described him as "pretty well bushed". Oviatt spent the night in Aberdeen and telephoned his wife at Huron about 10:30 p. m. and told her "he was never so tired in his life."

On Friday, Oviatt and Mrs. Bacon again worked her husband's route, which covered a different area but had about the same number of customers and they experienced the same difficulties making deliveries. They started on the route at about 7 a. m. and finished at about 5:30 to 6 p. m. after which he again did the bookwork, unloaded empties and loaded the truck for

Saturday morning. Mrs. Bacon said he was "completely exhausted". On Friday he complained about his leg,—"it seems to be kind of numb", and about being too weak to open the truck door. Weather conditions were substantially the same on Friday, except somewhat colder with temperatures varying from zero to minus twelve degrees. Irvin Hatlestad, a fellow employee at Aberdeen, saw Oviatt on both Thursday and Friday when he returned from the milk routes and described him on Friday night as "really tired" and in attempting to prevail on him to stay in Aberdeen and not return to Huron that evening, he said "Max, do you think you can make it? You are pretty nearly played out." He returned to Huron about 10:25 p. m. Friday and went to bed about 11 p. m. He was restless, pale, walked real slowly, felt clammy, complained of being cold, and perspired profusely. He complained about pain in his foot and his wife rubbed his foot and legs for about fifteen minutes. He got up about 8:30 a. m. Saturday morning contrary to his usual custom of rising at about 7 a. m. He looked tired, pale, and walked slowly, leaving for work about 9 a. m. He was late for lunch and went to bed about 1 p. m. and Mrs. Oviatt awakened him about 3 p. m. from a sound sleep. He got up slowly. That evening the Oviatts visited relatives near Huron from about 9 to 11:30 p. m. and he acted and looked very tired, contrary to his usual energetic self. They got home about midnight and Mrs. Oviatt rubbed his foot and legs for about five to ten minutes. He looked tired, pale, and moved very slowly, and looked about the same as the previous evening.

The industrial commissioner, based on the evidence related, found that the work Oviatt performed on Thursday and Friday under the then existing conditions required unusual exertion.

Sunday morning, January 18, Oviatt wakened his wife about 7 a. m. and said "I am ill" and "I have a terrible pain and I feel sick to my stomach and I am dizzy" and asked her to call a doctor. He was sweating profusely and terribly cold. Oviatt died about 8 a. m. shortly after the doctor arrived.

Dr. Carefoot, pathologist, performed an autopsy the next day and the autopsy report was received in evidence. The pertinent parts of such report are quoted:

"\* \* \* The coronary arteries show a moderate to marked atherosclerosis particularly of the anterior descending branch of the left coronary artery and of the circumflex branch of the left coronary artery, both showing extreme narrowing just beyond their origin. The lumen in the anterior descending branch is almost microscopic in size. There is a red clot in the distal portion of the narrowed area of the anterior descending branch approximately 3 cm. from the bifurcation. The narrowed area of the anterior descending branch of the left coronary artery is approximately 3 cm. in length \* \* \*"

The report summarized:

"This is a case of death due to acute coronary thrombosis. The findings indicate that the changes in the coronary arteries were long standing. The changes in the lungs and liver, specially the lungs indicate that some cardiac decompensation was present before the final episode of thrombosis."

Atherosclerosis is a form of arteriosclerosis where the blood vessels are reduced in their capacity to carry blood by reason of a deposit of fatty substances in the intima or inner lining and is a disease of the intima in which the fatty deposits impinge on the lumen (opening) of the artery and reduce the space through which the blood flows. From continued growth of these atherosclerotic plaques (deposits) there may be a complete occlusion or closing of the vessel. 2 Proof of Facts, p. 41.

The evidence is undisputed that Oviatt had no prior knowledge that he was affected with a cardio-vascular disease and that about a year before his death had successfully passed a physical examination on application for life insurance. He was described by lay witnesses and the family doctor as an energetic, jovial person and "a picture of good health". Death certificates of his parents were offered and received in evidence over objection. They show that his father died at the age of 55 years and 6 months of an acute coronary occlusion, and his mother died at an age of 60 years of a cerebral accident.

Three medical witnesses testified before the commissioner; two called by plaintiff and one by defendants. Dr. Saxton, the family doctor, testified to a life-time acquaintance, personal and professional, with Oviatt. He disclaimed being a heart specialist, but personally had two heart attacks and had read extensively on the subject, and testified that excessive physical exertion and work in cold weather are detrimental to heart patients. In response to a hypothetical question he gave an opinion that the unusual exertion of January 15 and 16 aggravated the disease and precipitated the death that occurred on January 18.

Dr. Carefoot, the pathologist who performed the autopsy, stated in his opinion the unusual exertion mentioned aggravated the disease and very likely caused the death; that atherosclerosis may have existed for one or two years. Dr. Carefoot in response to a question as to when the artery would have completely closed off answered: "Impossible to tell, it may never have closed off." He testified there was a recent thrombus (clot) in the area of the narrowing and in the same area there was a subintimal hemorrhage. (The autopsy report mentions a "red clot" without indication of its duration, and no mention is made of the subintimal hemorrhage.) Oral testimony of the pathologist described the thrombus as "very recent", not older than 24 hours and the subintimal hemorrhage as older "measurable in days, a few days or the exact time of age not being determinable." He testified that if heart failure was present as described in the autopsy report for any great length of time it would manifest itself in the patient by symptoms of undue tiredness, shortness of breath, pain, and that the condition found in the lungs and liver was consistent with the rupture and thrombus following unusual exertion at Aberdeen and that the exertion very likely caused the internal hemorrhage and in turn caused the thrombus that resulted in death.

Dr. Billion, defendant's witness and an internist, described atherosclerosis as a degenerative disease of the blood vessels which starts with birth and its progress varies with different people, sexes, and races, and that there are varying opinions among medical men as to its cause, with heritage entering into it. It was his opinion that physical work does not cause atherosclerosis; that coronary thrombosis and coronary occlusion are

synonymous; that it is not a sudden thing and is a matter of months or years; that physical labor would not have anything to do with **creating** the atherosclerotic condition shown in the autopsy report; that Oviatt inherited a very poor vascular system from one or both of his parents; that the coronary thrombosis was inevitable and predestined to happen. He further testified:

"Q Where you do have a person such as the autopsy report shows here, what, in your opinion, is going to happen?

"A He is going to have coronary, coronary occlusion. When he is going to have it, I don't know. I don't think the Lord knows. * * * According to the autopsy report the coronary arteries were very (schlerosed.) **One was practically obliterated.** Microscopic opening. * * * this process had been going on for a period of time and that it was not something that occurred in the matter of two days. Therefore I feel that he would probably have had a coronary sometime regardless of what he was doing. It might have been a matter of two days or a few weeks, one way or the other, but he would have had the coronary. And I think he would have developed a coronary if the work he did had nothing to do with it. I think it would have been a matter of a few days or few weeks. * * * On the other hand he may have lived a matter of a few days or a few weeks longer had he not done any work. * * * He (Carefoot in autopsy report) primarily speaks of athereosclerotic process and remarks how much that was. **Then he doesn't go into describing the thrombosis.** He says he died from coronary thrombosis. I am one hundred per cent in agreement with what he found. * * * The thing I wanted to do was to look and see whether he described the actual clot. I(t) didn't find a clot but in a sudden death like this that happens so suddenly before death occurred, that this is a normal finding. I agree with everything he says." (Emphasis supplied.)

Dr. Billion with reference to heredity as a basis for his opinion on cause of death said:

"Q But would you expect them to die twenty-five years younger?

"A I would not be surprised. I would not be surprised at what age they died. Not at 20.

"Q You would not be surprised if they died at 60?

"A No."

In response to a hypothetical question, omitting reference to a subintimal hemorrhage and a recent blood clot, Dr. Billion answered:

"As I stated previously, I believe that this man was predestined to die from coronary occlusion, whether it happened that day or a week or two weeks from then; I don't know whether this type of exercise or this work you describe speeded that up. It possibly could have speeded up the death a matter of a few days or, at the most a few weeks. * * *"

With reference to the subintimal hemorrhage, Dr. Billion was asked:

"Q I don't know whether the autopsy report shows this, or not, but the testimony of Dr. (Conefoot) was that there was a (sub-anemal) (hemmorage).

"A I don't think that is part of the autopsy report.

"Q Doctor, I think you testified on direct examination that it was impossible to tell the progressive rate of athereosclerosis?

"A Yes.

"Q Then how could you predict that this man would have died within any given length of time as a result of this Athereosclerosis?

"A Based on the autopsy report and the condition of the blood (vessles.) In other words, **assuming** that what

he describes here he is describing an extreme case of athereosclerosis, in my opinion indicating that the opening has been **practically obliterated** in the blood vessel. * * * Almost microscopic in size. * * * If I got that report from a pathologist in Sioux Falls that would be about telling me you could not get blood through the artery. * * *"
(Emphasis supplied.)

And finally the doctor concluded his testimony by stating that there were two processes which result in a coronary occlusion: The one being from formation of a clot, a collection of platelets, and the other from an occlusion resulting from a sclerotic condition.

The industrial commissioner found as follows:

"That the Employee had a subintimal hemorrhage which caused the thrombus which occluded the artery and thus produced the death. The evidence is indefinite and uncertain as to the time this subintimal hemorrhage occurred. The evidence is purely speculative as to the time the rupture of this blood vessel occurred. In the opinion of the pathologist, this hemorrhage could have occurred one week before death occurred; that the condition in the lungs and liver indicated that there could have been heart failure as much as a month before the death occurred; that the subintimal hemorrhage has not been linked with any degree of certainty with the exertion which occurred on January 15 and January 16, 1959. That it is purely speculative and conjectural to say that the exertion had any causal connection with said subintimal hemorrhage. * * *"

and concluded therefrom as follows:

"That at some time prior to the death of said Employee, said Employee suffered a subintimal hemorrhage; that this hemorrhage was the direct or proximate cause of the ultimate death of said Employee, * * *."

and that "the Claimant has failed to establish by a fair preponderance of the evidence that the extreme exertion caused or ag-

·gravated this subintimal hemorrhage," and that "the unusual ex-erton did not cause death, and it is purely speculative as to wheth-·er it might have hastened the death of said Employee."

■ We feel that the industrial commissioner erred in find-ing that claimant had failed to meet the burden imposed upon her to prove the facts requisite to recovery. We recognize and affirm the rule that has been well established by our decisions that it is not the province of the appellate court to pass on the weight of the evidence where it is conflicting in substancial particulars and to determine where the preponderance lies. But in the instant case we are satisfied that the claimant's proof was sufficient and that the commissioner erred in denying an award.

■ We feel that the facts, circumstances, and conditions testified to by lay witnesses and the medical witnesses upon a careful review of the entire record is sufficient to sustain the bur-den of proof to establish that the unusual exertion on January 15 and 16 as found by the commissioner aggravated a pre-existing disease and caused, precipitated, or contributed to the death of Max Oviatt on the morning of January 18. This is sufficient under our decisions. Campbell v. City of Chamberlain, supra.

> "Nothing is better established in compensation law than the rule that when industrial injury precipitates dis-ability from a latent prior condition, such as heart dis-ease, cancer, back weakness and the like, the entire dis-ability is compensable, * * * no attempt is made to weigh the relative contribution of the accident and the pre-existing condition to the final disability." 2 Larson, Workmen's Compensation Law, p. 56, and

> "* * * the relative contribution of the accident and the prior disease is not weighed, nor is the shortened life expectancy of the employee because of the disease considered. The general idea is that, even if the decedent would probably have died of cancer in any case, the em-ployment is deemed for compensation purposes the cause of the death if, due to a blow hastening the cancer, the employee dies today instead of six months from now." 1 Larson, Workmen's Compensation Law, p. 175.

See Woodbury v. Frank B. Arata Fruit Co., 64 Idaho 227, 130 P.2d 870.

The testimony of the lay witnesses shows a continuous and uninterrupted sequence of facts, conditions and circumstances that establish but a single fair and reasonable inference that the unusual exertion of January 15 and 16 aggravated the disease and fixed the time, place and circumstance required by our decisions and was not speculative or conjectural. Dr. Saxton, the family doctor, so testified. The testimony of Dr. Carefoot when considered in its entirety, and recognizing the difficulty of pinpointing the **exact** time, allows but one reasonable inference that the unusual exertion of January 15 and 16 precipitated the final episode of death. Medicine is an inexact science and because medical testimony of an expert is cautious, this does not justify its disregard as not substantial or credible or impair its weight.

We are not impressed with Dr. Billion's doctrine of predestination, or theory of disease heredity. We have been unable to find a single heart case to support him on such theory in denying awards. However, assuming that such is a recognized theory, we do not believe his testimony supports the decision of the commissioner. Dr. Billion had no prior acquaintance with the decedent. He was not present when the autopsy was performed. He apparently never discussed the autopsy with the pathologist and heard none of his testimony. He had a copy of the report and viewing his testimony in its entirety leads to the conclusion that the opinion he expressed was based almost solely on such report. The autopsy report is incomplete. It makes no reference to a subintimal hemorrhage, which the commissioner found. It mentions a red clot in the area of the occlusion (which Dr. Billion apparently overlooked, because he said he didn't find a clot) but there is nothing in the report to indicate its duration, and the commissioner found this clot or thrombus occluded the artery resulting in death. The report describes the lumen (opening) as almost miscroscopic in size. To Dr. Billion this meant it was practically obliterated. The pathologist in oral testimony describes the subintimal hemorrhage, the recent clot, of not more than twenty-four hours duration, in the area of the occlusion, and with reference to the lumen and the term "almost microscopic size", he said it may never have closed off.

The testimony of Dr. Billion considered in its entirety obvious-
ly premises his opinion on the fact that Max Oviatt was affected
with atherosclerosis and that there was a progressive degenera-
tion of the blood vessels which finally occluded causing death,
and the assumed fact that there was no subintimal hemorrhage
and no clot or thrombus, or at least no recent clot or thrombus,
and that death was the result of the normal progress of the dis-
ease.

 Expert testimony is no stronger than the facts upon
which it is predicated. Mark v. Industrial Acc. Comm., 29 Cal.
App.2d 495, 500, 84 P.2d 1071; Blankenfeld v. Industrial Acc.
Comm., 36 Cal.App.2d 690, 98 P.2d 584. In these cases, the rule
stated in Winthrop v. State Industrial Acc. Comm., 213 Cal. 351
at p. 354, 2 P.2d 142 at p. 144, is cited:

> "The case does not present a true conflict of evi-
> dence. The opinions of the doctors who were of the view
> that the fall did not produce the twisting of the pedicle,
> as stated in their letter reports, were based on the theory
> that severe symptoms did not appear until some time
> after the fall. The evidence, on the other hand, shows
> the petitioner suffered severe abdominal pains almost im-
> mediately thereafter, although her condition naturally be-
> came aggravated as time elapsed. Said opinions, being
> based on a state of facts not shown by the record to exist,
> are not in conflict with the opinions of the doctors whose
> statements were based on the facts actually shown to
> exist by the evidence of petitioner and the doctors who at-
> tended her."

 The value of an opinion from an expert is dependent
on and entitled to no more weight than the facts as a foundation
therefor, and unless the basis of such opinion is supported by
proper facts, it is without probative value. Johnson v. Munsell,
170 Neb. 749, 104 N.W.2d 314.

We deem of further significance the testimony of Dr. Billion
that on the unusual exertion of January 15 and 16, he admitted
that it may have speeded up the death, which, if it did, is suf-

ficient under our decisions to sustain an award, Campbell v. City of Chamberlain, supra, and as was said in Mark v. Industrial Acc. Comm.,supra:

> "Assuming, if necessary, that decedent was afflicted with a weak and somewhat devitalized heart, that in itself is not determinative of the question here. If deceased was afflicted with such a condition and thereafter subjected himself to violent exertion and extraordinary strain in the course of his employment which caused his death sooner than he otherwise might have suffered, his dependents are entitled to compensation."

citing Eastman Co. v. Industrial Acc. Comm., 186 Cal. 587, 200 P. 17.

We are aware that despite medical testimony, uncontradicted or otherwise, the responsibility for the decision rests with the commissioner and that circumstances may justify the trier of fact to disregard expert opinion, but we hold that upon the entire record it was without substantial credible evidence and palpably unreasonable for the commissioner to find that there was no causal relation between the unusual exertion of January 15 and 16 and the death of Max Oviatt that occurred on January 18. Campbell v. City of Chamberlain, supra.

The judgment of the circuit court is affirmed.

· All the Judges concur.