**Denis LATHER, Claimant and Appellee,**

v.

**HURON COLLEGE, Employer,**

and

**U.S. Insurance Group,
Insurer, Appellants.**

**No. 15627.**

Supreme Court of South Dakota.

Argued May 19, 1987.

Decided Sept. 30, 1987.

Rehearing Denied Nov. 6, 1987.

Russell H. Battey of Gallagher & Battey, Redfield, for claimant and appellee.

Michael J. Schaffer and Timothy M. Gebhart of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for appellants.

MILLER, Justice.

In this case of first impression we reverse the trial court's holding that appellee Denis Lather (Lather) is entitled to worker's compensation benefits for physical injuries sustained as a result of a suicide attempt, triggered by a mental disability, allegedly occasioned by work-related stress.

## FACTS

Lather's physical injuries occurred in 1984 when he jumped from a moving car, which was transporting him to the Human Services Center for treatment of mental illness.

Lather had graduated from high school in 1970 and Dakota State College in 1974. He continued his higher education and ultimately received a Master's Degree in secondary administration and physical education from the University of South Dakota. Upon leaving the University, he returned to Dakota State College as an assistant football and basketball coach and as an instructor of health and physical education. In June of 1983, Lather signed a teaching contract with Redfield High School, which included the responsibility of coaching football in the fall. Two months later, Huron College of Huron, South Dakota, offered him the position as head basketball coach. It had been his life-long dream to coach a college basketball team, so he discussed the Huron College offer with Redfield High School officials and school board members. Some of these persons were angered at his desire to leave and mention was made of revoking his teaching certificate and taking him to court to require him to honor his contract. Ultimately, an agreement was reached in which the high school consented to release Lather if he would continue his high school teaching duties until mid-September and finish the season as head football coach. Accordingly, he began teaching at Huron College in mid-September and working as head basketball coach in early October. Because the high school football season was not over until the end of October, Lather drove from Huron to Redfield (approximately 100

miles round trip) four times a week to attend the remaining practices and games. He had a successful football season at Redfield and apparently was well liked by his athletes.

Lather found that conditions were not as he had anticipated when he took over the basketball program at Huron College. First, practice gear and game uniforms had been stolen. He next discovered that of the fourteen players on his roster three had not even graduated from high school, one was AWOL from the service and two others were academically ineligible. This left too few players with which to scrimmage. Lather also encountered disciplinary problems with some of his remaining players. During one practice session, a player he had disciplined threatened Lather with a knife. Although the student withdrew from the college in November, Lather was dissatisfied that the school's president did not take a firmer stance against the student. On one occasion Lather was required to discipline certain players for drinking, leaving only five players available for one game (which, in Lather's opinion, caused the team's narrow defeat). Lather also had difficulty with players on work-study, who requested Lather to sign their time sheets without requiring them to perform the specified work.

The facilities afforded Lather by the college also failed to meet his expectations. His office was in a storage area, totally unequipped except for a telephone. He had to collect furnishings himself from other locations on campus. After outfitting his office, portions of the ceiling fell down and pipes leaked water into the office. He was particularly distressed over the situation because the office was where he would interview prospective recruits.

In short, Lather understandably found the experience at Huron College extremely stressful. He also felt guilt and stress at leaving his high school post. In addition to the instances set forth above, Lather also placed a great deal of pressure upon himself to have a successful win/loss record. This apparently was heightened by the fact that his predecessor had an extremely successful record. Also, Lather was required to arrange a basketball tournament over the Christmas holiday for which he had no prior experience. In addition to other stressors, his team was losing the majority of its games.

Lather began developing a mental disorder, presumably because of these stresses. He first sought counseling on December 14, 1983, when he went to Community Counseling Services Center in Huron (counseling service). There he was interviewed by various professionals including Frank Dame (Dame), a clinical psychologist. Among other things, Lather complained of inability to sleep and blackouts. Dr. Herman, a psychiatrist, prescribed medicine for the sleep disorder. Lather was also examined by a neurologist, who found the possibility of organic brain disorder. Dame then counseled Lather on an outpatient basis, and recommended that he return to visit his mother over the Christmas holiday.

During a session with Dame on December 27, 1983, the psychologist noted that Lather's condition had deteriorated since their last visit and that he had begun to experience suicidal thinking. In fact, Lather had written a suicide note. Dame recommended that Lather be hospitalized at McKennan Hospital in Sioux Falls, South Dakota.

Lather was hospitalized from December 28 through January 11 and his treating psychiatrist was Dr. Kennelly. Lather exhibited psychotic behavior while in the hospital and hallucinated that various objects and persons were present when they were not. However, on January 11, 1984, Kennelly discharged Lather from the hospital because his depression and agitation had subsided. He was instructed to continue outpatient treatment at the counseling service in Huron.

Upon his return to Huron, he and Dame discussed the possibility of resigning from his position at Huron College. Lather was leaning towards resigning at that time and ultimately resigned on January 17, 1984.

Lather continued to reside in Huron, and his mother now lived with him. On January 24 his mother contacted Dame, indicat-

ing Lather was experiencing severe difficulties in sleeping, was disorganized in his thinking and behavior, and had increased his comments about committing suicide. Dame consulted with Dr. Herman and the decision was made to commit Lather to the Human Services Center in Yankton, South Dakota, for inpatient treatment. The counselors were preparing to commit Lather on an involuntary basis if he would have refused to be admitted voluntarily. Although initially upset at the prospect, Lather agreed with the plan that he be voluntarily committed.

Two deputy sheriffs were assigned to transport Lather to the Human Services Center. After consulting with the medical staff at the counseling center, the decision was made not to place Lather in restraints. One of the deputies drove, with Lather sitting in the passenger side of the front seat and the other deputy sitting in the back seat directly behind Lather. The deputies began conversing with Lather, and he appeared coherent. After traveling approximately thirty miles, Lather opened his door. Although the deputies attempted to grab him, he pulled away and jumped out of the car (which was traveling 55–65 mph) resulting in severe physical injuries to Lather.

The worker's compensation hearing officer found, in accordance with the testimony, that Lather was attempting suicide by jumping from the car. The hearing examiner also found that Lather was poorly predisposed to handle stress, especially in coaching situations; that Lather's stress was "essentially self-imposed, and the instances of stress that he identified with his job at Huron College would not have caused the average person to react in the same way [Lather] did"; and that Lather's condition was not a compensable injury.

The circuit court, in reversing the hearing examiner's holding, did not determine that any of the agency's findings of fact were clearly erroneous. The trial court did, however, in its own findings of fact and conclusions of law determine that Lather's injuries were compensable and that the mental condition was not caused by any sudden stimulus, but developed gradually over time.

## ISSUE

Although Huron College and its insurer raise many issues in this appeal, the central issue, which is determinative, is as follows:

IS A MENTAL DISABILITY PRODUCED SOLELY BY MENTAL STIMULII OR STRESS COMPENSABLE UNDER OUR WORKER'S COMPENSATION LAW?

We hold it is not.

## DECISION

It is settled law in this state that our worker's compensation law is remedial in nature and should be liberally construed to effectuate its purpose. *Wold v. Meilman Food Industries*, 269 N.W.2d 112 (S.D. 1978); *Oviatt v. Oviatt Dairy Inc.*, 80 S.D. 83, 119 N.W.2d 649 (1963); *Meyer v. Roettele*, 64 S.D. 36, 264 N.W. 191 (1935). While the foregoing is true, worker's compensation "is not intended to be health, accident, and old age insurance and spread general protection over risks common to all and not arising out of and in the course of employment." *Roberts v. Stell*, 367 N.W.2d 198, 200 (S.D.1985) (quoting *Adkins v. Rives Plating Corp.*, 338 Mich. 265, 270, 61 N.W.2d 117, 120 (1953) (quoting *Simpson v. Lee & Cady*, 294 Mich. 460, 463, 293 N.W. 718, 719 (1940)).

SDCL ch. 62–4 provides worker's compensation for certain job-related "injury." Under SDCL 62–1–1(2), "injury" is defined as "only injury arising out of and in the course of the employment, and shall not include a disease in any form except as it shall result from the injury[.]" In our view, the issue here is not whether Lather's physical injuries were intentional, self-inflicted injuries barring compensation under SDCL 62–4–37; nor whether his physical injuries (as opposed to mental disability) arose out of and in the course of his employment when they occurred approximately one week after he voluntarily resigned his position at Huron College; nor whether his mental disability arose out of and in the course of his employment. Rather, the

central issue is whether mental disabilities produced solely by gradual mental stress are compensable "injuries" under SDCL 62–1–1(2).

This issue has been analyzed at length and in detail by Professor Larson in his voluminous work "Workmen's Compensation Law." 1B Larson, § 42.21 et seq. *See also* Sersland, Mental Disability Caused by Mental Stress: Standards of Proof in Workers' Compensation Cases, 33 Drake Law Review 751 (1983–84).

We are mindful of and sensitive to the position that mental illness or disability caused by mental stress is as real as other disabilities and that there is no real distinction between physical and mental injuries especially as it relates to the person injured. However, we find nothing in our statutes wherein the legislature has even implied an intention to provide worker's compensation coverage in these cases.

Prior to 1975, SDCL 62–1–1(2) defined injury as: "Only injury *by accident* arising out of and in the course of employment...." (Emphasis supplied.) In 1975 the phrase "by accident" was repealed by the legislature. 1975 S.D.Sess.L. ch. 322, § 1. Prior to such amendment, a requirement of "unusual exertion" was required with respect to heart attack and other cases dealing with aggravation of a pre-existing condition. Like the Minnesota Supreme Court in *Lockwood v. Independent School Dist. No. 877*, 312 N.W.2d 924 (Minn.1981), we are unable to determine or hold that the legislature in enacting the law in its present form

> ... intended to impose on employers liability for compensation for an employee's disabling mental condition resulting from work-related mental stress. Under the prior law no employee had claimed compensation for such a disability, and it seems unlikely that the legislature contemplated the possibility of such claims when it enacted the ... revision.... Reallocating the costs resulting from stress-related disability between health

insurance and workers' compensation insurance is a major policy determination. In the absence of proof that the legislature considered the far-reaching ramifications of extending workers' compensation coverage to employees who are mentally disabled by employment-related stress, we decline to construe the Workers' Compensation Act in a manner probably not intended by that body.

*Lockwood,* 312 N.W.2d at 927.

We are not lawmakers nor policy makers. That function is quite appropriately reserved to the legislature under our constitution. S.D. Const. art. III, § 1; art. V, § 5; *Petition of Famous Brands, Inc.,* 347 N.W.2d 882 (S.D.1984); *Jordan v. Duprel,* 303 N.W.2d 796 (S.D.1981); *Matthews v. Linn,* 78 S.D. 203, 99 N.W.2d 885 (S.D. 1959); *McFarland v. Keenan,* 77 S.D. 39, 84 N.W.2d 884 (S.D.1957); *Rosebud Lumber & Coal Co. v. Ryan,* 67 S.D. 72, 289 N.W. 81 (1939); 16 Am.Jur.2d *Constitutional Law* § 316 (1979); 73 Am.Jur.2d *Statutes* § 197 (1974). Although we are sympathetic to the unfortunate plight of Lather, we believe that only the legislature can address this specific contention.[*]

The judgment of the circuit court is reversed and remanded with direction to enter an order affirming the administrative agency.

WUEST, C.J., and MORGAN, J., concur.

HENDERSON and SABERS, JJ., dissent.

HENDERSON, Justice (dissenting).

I respectfully vote a dissent in this case realizing that the elusive statutory interpretation, which we, as Justices of this Court must cope with, is foursquare before us.

A Decision was entered by the trial court on the 5th day of December, 1986. Formal Findings of Fact and Conclusions of Law were also entered on the same date by the trial court. Under SDCL 1–26–36, a trial

---

[*] Although probably not relevant, it is not as though Lather is without financial assistance. He had health insurance coverage to pay the bulk of his medical bills and he has applied for and is receiving monthly disability benefits from social security.

court may affirm the decision of an agency or remand the case for further proceedings; a trial court may further reverse or modify the decision if substantial rights of the appellant have been prejudiced; and a trial court is permitted to enter its own findings of fact and conclusions of law or it may affirm the findings and conclusions entered by the agency as part of its judgment. Here, the trial court entered its own findings of fact and conclusions of law, refusing to adopt the agency's findings and conclusions and did enter, by its formal decision, a reversal. The reversal remanded the case to the Deputy Director of the Division of Labor and Management of the South Dakota Department of Labor for "further proceedings in accordance with this Decision."

Essentially, the trial court determined that Denis Lather's mental breakdown arose out of, and in the course of, his employment with Huron College; further, that the mental breakdown was an employment-related injury which was the substantial cause of his attempted suicide and flowing injuries.* With this conclusion, I agree. We are told by the Legislature, via SDCL 2-14-1, that a word in a statute, such as "injury," "[is] to be understood in [its] ordinary sense." *See Oahe Conservancy Subdist. v. Janklow*, 308 N.W.2d 559, 561 (S.D.1981). Thus, the trial court concluded that the hearings examiner made a decision affected by error of law. SDCL 1-26-36(4). Buttressing statutory interpretation and "ordinary sense" with "common sense," I wish to cite the following:

> One of the best general definitions of "injury" was provided in an early Massachusetts opinion:
>
> "In common speech the word 'injury,' as applied to a personal injury to a human being, includes whatever lesion *or change* in any part of the system *produces* harm or pain or *a lessened facility* of the natural use of any bodily activity or capability."

A. Larson, *Workers' Compensation Law: Cases, Materials and Text* § 30, at 199 (1984) (emphasis added) (footnote omitted) (quoting *In re Burns*, 218 Mass. 8, 11, 105 N.E. 601, 603 (1914)). Surely, Lather's difficulties fall within the above definition of "injury," approved by the words of Professor Larson, especially when viewed in light of the well-established law of this state, that worker's compensation laws should be liberally construed to effectuate its purpose. *See Meyer v. Roettele*, 64 S.D. 36, 40, 264 N.W. 191, 193 (1935). Perforce, the trial court reasoned, Denis Lather was entitled to worker's compensation benefits for his disability, allegedly $8,921.05 in medical and surgical expenses as of June 1984, and hospital expenses of $45,976.90 as of the same date.

In reviewing this record, it is noted that there appears to be no transcript of testimony transcribed at the circuit court level. However, the circuit court judge did do his duty by reviewing "extensive briefs" and reviewing "all of the files, records, briefs, and depositions herein...." There are seven depositions on file. The circuit court judge could read them just as well as the hearings examiner. Of the seven depositions, six of them were "medical" depositions. One deposition was by the Associate Professor of Physical Education and Wrestling Coach at Huron College. There were approximately eight lay witnesses called before the hearings examiner. In addition, there are four exhibits on file, consisting of letter form, two consultations, and a Division of Criminal Investigation interview. The trial court had to examine some "cold exhibits" and so does this Court. The hearings examiner had the benefit of observation of demeanor and judging credibility of approximately eight lay witnesses.

The majority opinion determines that a work-induced stress related disfunction is not compensable under our worker's compensation law. A majority of jurisdictions,

---

\* Contrary to the majority opinion's declarations, SDCL 62-1-1(2) does *not* define injury. Instead, that statute discourses on temporal aspects of injury necessary to trigger compensation. *See id.* When arriving at the intent of the Legislature, we presume that words used in statutes were used to convey their ordinary popular meaning. *Oahe Conservancy Subdist. v. Janklow*, 308 N.W.2d 559, 561 (S.D.1981).

under similar facts, would likely permit Lather to receive compensation. We should not forget that a key factor to compensation awards, in these types of cases, is that the stress from which an employee succumbed is sufficiently greater, intense or more damaging than the stress encountered by most employees engaged in everyday employment life. *See* 1B A. Larson, *The Law of Workmen's Compensation* § 42.23(b), at 7–668 (1987). In this vein, Lather's position at Huron College involved hyper-stressful situations. Indeed, Denis Lather was subjected to degradation, humiliation, and identifiable stress by personnel of Huron College, to include its President, which caused him to have a mental breakdown. He refused to be dishonest and sign work sheets when athletes would not work and was confronted with three players who were not high school graduates, one a.w.o.l. player, and two academically ineligible players. Lather was told by the president that coaches were a dime a dozen after he wanted a player expelled for pulling a knife on him. In sum, to win at Huron College was elevated over all principles. Lather encountered disciplinary problems because of players staying out late at night drinking intoxicants. Athletic gear was being stolen and he was accountable for the inventory. Lather was caught up in an ugly, depraved situation, not based upon one single incident, but a series of incidents. It was stress beyond the ordinary day-to-day stress to which other employees are similarly exposed. From a loved and successful coach at Redfield High School, he was exposed to a situation at Huron College which inflicted great emotional trauma upon him. Ultimately faced with being taken to our state hospital for the mentally ill, he jumped from a moving car, traveling 55 to 65 miles per hour, inflicting grievous physical injury upon himself. In short, his injuries, both mental and physical, did have a cause-result nexus.

Lather's depression, emotional trauma, and mental injury arose out of and in the course of his employment with Huron College. Physical injuries from the car-jumping incident also arose out of and in the course of his employment with Huron College because his mental injury and plight was the substantial cause of the attempted suicide.

Huron College is an employer within the definition of SDCL 62–1–2 and Lather is an employee within the definition of SDCL 62–1–3. There is some suggestion that Lather was not a well-balanced, all-around individual; there is suggestion that, perhaps, he was susceptible, inherently, to a nervous breakdown. However, Huron College recruited him, and were extremely aggressive in wooing him away from Redfield High School. Huron College worked upon his dreams to be a college coach. Huron College took Denis Lather, as they found him. So the suggestion of a preexisting condition, does not hold water under the settled law of this state. *Harden v. South Dakota Credit Union League, Inc.*, 87 S.D. 433, 209 N.W.2d 665 (1973). In this connection, I cite Professor Larson's treatise, *supra* § 42.23(c), at 7–670–71:

> In line with the normal compensation principle that aggravation of a preexisting weakness or disease is a compensable injury, it is clear that the majority rule is not weakened by the fact that the claimant may have had a preexisting neurosis or latent nervous weakness on which the employment acted without physical trauma to produce the ultimate injury. This is the standard rule when a physical trauma precipitates a prior condition, and it should be no less so when the stimulus is nonphysical. There appears to be no reported decision in which compensation was denied in this type of case solely because there was a preexisting neurotic tendency. (Footnotes omitted.)

In this case, the hearings examiner wholly failed to appreciate the coaching situation that Lather was in and tried to wash it away by intimating that Lather "was predisposed to handling stress in coaching situations poorly." This type of mental block in the mind of the hearings examiner simply distanced any support of Lather's stressful situation; furthermore, it was a disregard of the law as I have just now written.

If, indeed, Lather became deranged, and the Huron College authorities and the Beadle County authorities thought so, he is not responsible for committing an "intentional" tort upon himself. People who suffer from deep depression and despair, who are bereft of their good judgment, should not be held accountable for inflicting intentional torts upon themselves. Surely, this college coach had working conditions far from a normal coaching position in a college in South Dakota. He did not only perceive or imagine that he was being mistreated. He was mistreated. And should he not, on the scales of justice, be compensated for this mistreatment which has caused his work-related injury?

Finally, Lather should not be denied relief due to a generalized fear of sham, psychologically based worker's compensation claims. That is not a viable concern in this case where a stress-induced psychological disfunction culminated in Lather's leap from a moving vehicle. I would uphold the circuit court judge upon this basis: This young coach suffered a mental injury caused by traumatic strain and anxiety which is a "compensable" injury under SDCL 62–1–1(2).

SABERS, Justice (dissenting).

I dissent.

The hearing officer was wrong in holding that Lather's condition was not a compensable injury because the "average person" would not have reacted in the same way. Even if this were the test, and it is not, common sense disputes that conclusion. I would affirm the trial court's conclusions that Lather's injuries were compensable under South Dakota's worker compensation laws.

The majority opinion gives lip service to the accepted proposition that "our worker's compensation law is remedial in nature and should be liberally construed to effectuate its purpose." The majority opinion states that "[w]e are mindful of and sensitive to the position that mental illness or disability caused by mental stress is as real as other disabilities and that there is no real distinction between physical and mental injuries especially as it relates to the person injured[,]" yet concludes that "[W]e find nothing in our statutes wherein the legislature has even implied an intention to provide worker's compensation coverage in these cases." The majority opinion defies logic, the mandated role of this court as interpreter of this state's laws, and the caselaw of the majority of other jurisdictions with this feeble attempt to hand to the legislature the work of this court.[1]

The fact is that the legislature has not, expressly or impliedly, stated an intention to *exclude* worker's compensation coverage

---

**1.** In light of the nature and purposes of worker's compensation acts, the recent decisions adopting flexible interpretations of "injuries" represent the better approach. If the purported goal of the statute is to indemnify employees who become disabled from work-related incidents, then the object of inquiry should be the causal relationship between the employment and the disability—not the classification of the injury. Imposing definitional restrictions based on artificial distinctions seriously undermines the achievement of providing support and preventing destitution. Such restrictions deny compensation to disabled workers merely because they did not happen to become injured in the proper way.

Unless the South Dakota Supreme Court follows the Minnesota example of refusing to construe the meaning of "injury" in favor of deferring the matter to the Legislature, the court will ultimately be forced to address the issue. Deferring the question might be defensible because of the policy considerations involved, however

this course of action is less than exemplary. Declining to construe the term "injury" would represent circumvention of a judicial issue through the convenience of subject matter relegation. Such deferral directly conflicts with the judiciary's vested duty to construe statutes and resolve questions of law. This obligation is not suspended merely because of the existence of novel facts or policy considerations. Because worker's compensation laws are "remedial in character and are entitled to a liberal construction," the South Dakota Supreme Court should determine that employees who are disabled by mental stimuli are entitled to compensation. In the absence of legislative mandate to the contrary, the ideals and policies of worker's compensation dictate that employees disabled from *all* work-related incidents should be entitled to relief.

*Mental Disorders and Suicide as Compensable Injuries Under Worker's Compensation: Will South Dakota Follow the Trend?* 30 S.D.L.Rev. 636, 641–42 (1985).

in these cases. On the contrary, it can be argued that by repealing the phrase "by accident" in 1975, the legislature intended to provide worker's compensation coverage in a less restrictive manner and intended coverage to be extended to these types of cases.

The majority opinion attempts to hide behind the old cliche that "we are not lawmakers nor policy makers." In this case, we do not have to be. We simply have to serve justice by interpreting the statutory and common law. To do less avoids responsibility. If our interpretation of the law in this case is in error in the eyes of the legislature, the legislature can remedy the situation by new law or policy (clearly expressed).[2]

The issue is whether mental disabilities produced by work-related stress are compensable "injuries" under SDCL 62–1–1(2). Dr. Kennelly testified that the employment at Huron College was a competent-producing cause of the mental condition and the physical injuries subsequently suffered. Accordingly, whether or not "sympathetic to the unfortunate plight of Lather," we *should* interpret the law and determine that his injuries are compensable.

A review of caselaw and interpretations of similar compensation statutes shows that the majority of jurisdictions in the United States would find claimant's injuries compensable.[3] Other courts have applied various analytical approaches to the question of compensation for mental disability. The majority opinion, after expending much time and effort in carefully laying out the facts, never addresses any of these approaches. Instead, it cites the Minnesota case of *Lockwood v. Independent School Dist. No. 877*, 312 N.W.2d 924 (Minn.1981), to support its decision to not decide. The majority, however, fails to note that when the Minnesota court held in 1981 that the legislative intent in amending its worker's compensation statute could not be determined, that court was discussing an amendment enacted in 1953. This court is being asked to interpret an amendment which was enacted in 1975. While the Minnesota court might be justified in asserting that "it seems unlikely that the legislature contemplated the possibility of such claims when it enacted the 1953 revision[,]" such an excuse is hardly plausible here. *Lockwood, supra* at 927. It should also be noted that as of 1984, the Minnesota Supreme Court was still waiting for the legislature to clarify its intent. *Egeland v. City of Minneapolis*, 344 N.W.2d 597 (Minn.1984).

I would affirm the trial court in holding that Lather's mental injury and breakdown and the resulting physical injuries are compensable injuries under SDCL 62–1–1(2), and that compensation cannot be denied because:

1) some undefinable "average man" might not have reacted the same way, or because

2) the injuries occurred due to an attempted suicide the week after Lather resigned his job, nor because

3) of a claim of "intentional" injury so as to deny coverage under SDCL 62–4–37.

---

2. The subject matter of the footnote on page 8 is not only "not relevant" but is received in clear violation of the "collateral source rule." *Travelers Insurance v. Manning*, 574 S.W.2d 237 (Tex. Civ.App.1978); *Twin City Fire Ins. Co. v. Gibson*, 488 S.W.2d 565 (Tex.Civ.App.1972); *Eichel v. New York Central Railroad Co.*, 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963).

3. *See generally*, 1A Larson, *The Law of Workmen's Compensation* § 36.00 (1985); 1B Larson, *The Law of Workmen's Compensation* § 42.00 et seq. (1987); S. Sersland, *Mental Disability Caused by Mental Stress: Standards of Proof in Workers' Compensation Cases*, 33 Drake L.Rev. 751,760 n. 44 (1983–1984). Comment, *Workers' Compensation and Gradual Stress in the Workplace*, 133 Univ. of Pa.L.Rev. 847,850 n. 6, 851 n. 11 (1985).