MYRLIE, Respondent, v. HILL, Appellant.

(236 N. W. 287.)

(File No. 6736.  Opinion filed April 13, 1931.)

*Bailey & Voorhees* and *Ray F. Bruce,* all of Sioux Falls, for Appellant.

*Mundt & Mundt,* of Sioux Falls, for Respondent.

MISER, C. This is an action against appellant, a physician, for damages alleged to have been caused by the negligence of his office assistant.  The negligence charged is that this assistant instilled into respondent's eye a liquid which partially destroyed the sight.  The appeal is from the judgment entered on a jury verdict and from orders denying defendant's motion for judgment notwithstanding the verdict and denying defendant's motion for a new trial.

There is a radical difference between the narrative of the occurrence on which the action is based as told by respondent and her witnesses and that as told by appellant and his assistant.  We are of the opinion that the verdict in favor of plaintiff, respondent herein, is decisive of the major question presented by this appeal, unless it be, as contended by appellant, that "in a malpractice case, especially in an eye case, there must be expert medical testimony showing negligence, and also that the injury complained of resulted therefrom."

In Ewing v. Goode (C. C.) 78 F. 442, 443, opinion by Taft, Circuit Judge, we find: "Before the plaintiff can recover she must show by affirmative evidence—first, that defendant was unskillful

or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury. The naked facts that defendant performed operations upon her eye, and that pain followed, and that subsequently the eye was in such bad condition that it had to be extracted, establish neither the neglect and unskillfulness of the treatment, nor the causal connection between it and the unfortunate event. A physician is not a warrantor of cures. If the maxim, 'Res ipsa loquitor," were applicable to a case like this, and a failure to cure were held to be evidence, however, slight of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' "

Respondent and her witnesses testified that on September 9, 1925, both lids of respondent's left eye were swollen, the eye was partly closed, the conjunctiva was red. A local physician examined the eye and stated that she had a sty. At the trial he did not recall having then seen any corneal ulcer. On September 10th a neighbor woman turned the eyelid over, looked into the eye, and, although the lids were swollen, saw nothing wrong with the eyeball, either the white part or the dark part. In the afternoon of the 10th, respondent went to appellant's office in Sioux Falls, S. D., twenty miles from her home in Hills, Minn. At that time her eye was nearly closed. Appellant examined the eye, said that it looked like a sty, lanced the upper lid, and squeezed the pus out. On his advice she did not return to her home, but stayed all night at appellant's home. The next day, the 11th, appellant's assistant treated the eye, after which appellant looked at it and said it was getting on fine. She had had no pain after he drained out the pus on the 10th. After the first night she stayed at the home of Mrs. Gulk. On the 12th she returned to the office where his assistant applied heat to the eye and put medicine in it. On the 13th, Sunday, she went to the office to see about going home. She could have seen good had she taken the bandage off. On the morning of the 14th he treated the eye again. On the morning of the 15th he took the bandage off and she was given the usual hot application. On that day, Tuesday, he told her to come again to the office on Wednesday when he would tell her whether he could take

her home, as he had stated on Sunday he would do. She did not go to his office Wednesday morning to take a treatment for her eye was then in perfectly good shape. On Wednesday afternoon at his office appellant said: "Well, tomorrow, Mrs. Myrlie, we are all going to Hills." While she was at the office Wednesday her son and daughter came there to find out why she had not come home on Tuesday. Appellant told them he would bring her home on Thursday. On Thursday morning she returned to the office. Appellant then said to her: "At five o'clock we are all going to Hills." She replied: "That sounds good." Over Mrs. Myrlie's objection that she did not need any further treatment, appellant instructed his assistant to give her another treatment. After a hot application, the assistant put some medicine in respondent's eye with an eye dropper. Respondent testified that the medicine burned like a hot poker; that it smelled like iodine with the odor of which she was familiar, that the medicine used in former treatments did not burn nor had she noticed its odor; that about five minutes later while "pretty near perishing with pain" she was told by the assistant that the doctor said she could go; that she left the office but came back because she could not see to get to the street car. That she told appellant she was blind in both eyes; that he then examined her eye and inquired of his assistant what she had put in her eye. She was still blind and sick after he washed her eye out. Later he took her to Mrs. Gulk's and when he led her into the house Mrs. Gulk inquired as to what was the matter. To this Mrs. Myrlie replied that Dr. Hill's office girl put the wrong medicine in her eye. Appellant then said to Mrs. Gulk: "Yes, she has got that in her head now." To which Mrs. Gulk replied: "It looks suspicious to me, doctor, to go down town with two good eyes and come back blind." Appellant then took respondent to the kitchen, washed out the eye again, and used some medicine that appellant had prescribed before. After that the pains in her eye got worse. She went to the hospital the following day where she was treated by appellant for over two weeks. Three or four days after she went to the hospital appellant told her that she had an ulcer on that eye. This was the first time he had mentioned an ulcer to her. After she left the hospital in Sioux Falls appellant treated her eye once. Her local physician treated it four times and then took her to a Minneapolis hospital where

she was treated for four and a half weeks. Before the treatment on September 17th both of her eyes were feeling fine. She does not know whether the dropper with which the medicine was instilled was full but enough was put in the eye so it would run out and it caused brown stains on her handkerchief. Whether it stained her face brown she does not know because she was blind after that. Before the treatment she did not use glasses except to do fine work. Since the treatment she uses glasses most of the time. After that treatment she suffered great pain and lost weight. As to the condition of the eye before the treatment on the 17th she is corroborated by the testimony of Mrs. Gulk, Mrs. Gulk's daughter, and respondent's son and daughter. As to the condition on the afternoon and evening after that treatment she is corroborated by the testimony of Mrs. Gulk and daughter. That she had a corneal ulcer or abrasion on the cornea on the day following, that is, on September 18, when she entered the hospital, and that her present impairment of vision is due to a scar caused by an ulcer, is conceded.

Both appellant and his assistant deny as wholly false respondent's narrative of the treatment given the eye on September 17th and of the events immediately following. Appellant's office record shows that on September 10, when respondent went to appellant's office, the tissues about the eye were swollen so that the eye was entirely closed. The record of that day recites:

"Impossible to see cornea or eyeball due to intense swelling. Diag. supra-orbital abscess, lanced with small cataract knife, large am't of pus evacuated, eye dressed with moist antiseptic dressing, patient advised to go to hospital for further treatment.

"Sept. 11th, treat, at office, arg. hot compresses.

"Sept. 12th, treat. at office, arg. hot compresses.

"Sept. 13th, treat. at office, swelling down. Can open eye. Small corneal ulcer found on eye. Atrophine 1% arg. hot compresses.

"Sept. 14th, same treat, ulcer spreading slightly.

"Sept. 15th, ulcer touched with 10% mercurochrome, arg. and hot comp. cont'd.

"Sept. 16th, same treat. eye no better.

"Sept. 17th, Complained of more pain,—arg. and heat cont'd and mercurochrome 10%.

"Sept. 18th, patient went to hospital."

Appellant's assistant testified that she made the foregoing entries on cards on the days the treatments were given. She was not at the office on Sunday, the 13th, which was the day, according to the office record, when the ulcer was discovered. She testified that the ulcer was discovered about two days after respondent first came in. Appellant testified that it was "about on Saturday, September 12th, that the swelling had subsided sufficiently to permit examintaion of the cornea." He then found an ulcer and told her that she had an ulcer. He testified that he gave respondent a treatment on Sunday practically the same as before. He testified that he saw what his assistant put into respondent's eye on the 17th. That he came into the room when his assistant was instilling the drops of argyrol into the patient's eye. Because argyrol temporarily discolors the eye, he asked his assistant why she had dropped in the medicine before he had examined the eye. The assistant replied that respondent had been complaining so she thought she would begin the treatment. In fact, except for both parties testifying that on the 17th appellant's assistant put some medicine in respondent's eye, the narrative of appellant and respondent agrees in almost no particular from respondent's appearance at the office on that day to the moment when appellant left her at Mrs. Gulk's residence. The medical experts who testified for appellant stated that in their opinion an eye dropper full of iodine had not been instilled in the eye on September 17th. One of them who examined the eye on September 20th found no evidence of such instillation. He testified that, had an eye dropper full of ordinary tincture of iodine been put into that eye within a week prior thereto, it would not have caused the ulcer which he found; and they all testified that putting tincture of iodine in the eye would not result in corneal ulcer; nor would instilling iodine once with an eye dropper have any effect toward accelerating the growth of an ulcer, although putting iodine in the eye by means of an eye dropper is not a proper way to treat an eye.

On rebuttal a medical expert testified that a quantity of iodine instilled into the eye onto the cornea would produce a drying of the cornea and thereby lower its vitality; pre-existing bacteria could then get hold and grow on the cornea and produce an ulcer; that if an ulcer already existed and a quantity of iodine was in-

stilled in the eye by means of an eye dropper, the iodine in the eye would enhance the virulence of the ulcer.

The jury heard all the testimony of which the foregoing is a part; saw the witnesses, examined the exhibits, were fairly instructed as to the law, and returned a verdict for respondent for $1,250, with interest. Respondent contends that because of this verdict the jury must have believed the testimony of appellant. That does not follow. The jury may have disbelieved part of the testimony of witness on behalf of each. But the trial judge heard and saw the witnesses, an advantage denied this court. Therefore the verdict, judgment, and orders must stand unless appellant's contention that there must be expert medical testimony showing negligence and that the injury complained of resulted therefrom is well founded.

Since the argument of this case in this court, and during the rather extended consideration which this case, by reason of its perplexity, has received, the Supreme Court of the United States has decided Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 234, 74 L. Ed. 720. In that case Mrs. Cooley brought action to recover damages from a Dr. Gunning. Her complaint was that he put into her ears some tissue-destroying fluid and thereby injured the drums and other parts of her ears. The jury returned a verdict for her and judgment thereon was affirmed in the Court of Appeals. 58 App. D. C. 304, 30 F. (2d) 467. At the close of all the evidence the defendant moved the court to direct a jury to return a verdict in his favor. He maintained that the evidence failed to show that plaintiff was injured by the negligence alleged and that it left the cause of her injury in the realm of conjecture. The motion was denied, and reversal was sought on that ground. It was not claimed by plaintiff in that case that defendant knowingly put the tissue-destroying liquid in her ears, but that he negligently did so while intending to apply oil.

In that case Mrs. Cooley testified that, after Dr. Gunning had treated her for several days for a nose trouble, she told him that she felt wax in her right ear. He stated that he would put some mineral oil in her ears. "There were several small white bottles and a dropper on a cabinet in his office. He took the dropper from one of the bottles and put some liquid in her right ear. She immediately suffered much pain, became dizzy and heard

great noises in that ear. He then put some of the liquid in her left ear. She experienced the same sensations, became very ill and lost control of her body. Other evidence shows that she went or was taken to a bed in defendant's house and there remained for some hours and until a friend came and took her to her mother's home." Dr. Gunning testified that Mrs. Cooley told him that her hearing had become impaired, and that her ears had been treated. He found both eardrums perforated. On her last visit she was nauseated and complained of dizziness and roaring in her head. He dropped mineral oil in her ears with a dropper to close up the external ears in order to prevent noise from penetrating into the middle ears. The noise subsided, she became composed, went to bed in his house, and remained until taken home by a friend. He denied that he put acid in her ears, and testified that he never had any in his office. The Supreme Court said:

"The evidence shows that, while difficult to do, it would be possible by means of a dropper to apply acid to eardrums without allowing it to come into contact with other tissues. There was no scar or anything to indicate that acid had touched any part of the canal leading to either eardrum. Plainly it would have been impossible for defendant to have closed the external ears without allowing the liquid used for that purpose to touch the canal tissues. But plaintiff was not required specifically to show what defendant did put in her ear or that the treatment destroyed either of her eardrums or made her deaf. If the evidence was sufficient to justify a finding that defendant negligently put a harmful fluid in her ears causing her pain and injury, the motion was properly denied.

"As the credibility of witnesses and the weight to be given to their testimony are for the jury, plaintiff's testimony as to the treatment and immediate effect upon her and the testimony of others as to her condition shortly afterwards constituted sufficient evidence to warrant a finding that instead of oil defendant negligently put some harmful liquid into her ears thereby causing her pain, suffering and some injury in and about her ears."

In Laughlin v. Christensen, 1 F. (2d) 215, 216, the Circuit Court of Appeals of the Eighth Circuit says: "It is true that there is a large class of malpractice cases in which the question or matter under investigation is so intricate and abstruse, or so little understood, that ordinary jurors would in all probability, know

nothing about the same, but must be guided by opinions of witnesses having special knowledge. In this class of cases the plaintiff fails to make a case for the jury in the absence of testimony of a properly qualified expert witness." After quoting from Ewing v. Goode, supra, citing cases thereof which are cited by appellant herein, stating that there are at least two other classes of cases dealing with the admission of expert testimony, and declaring that it is not a universal rule, even when the alleged negligence of medical men is under consideration, that testimony by experts is indispensable, the opinion proceeds: "The reason for the rule, that in certain cases testimony of experts is indispensable to establish negligence, is that, in order to reach an intelligent conclusion on the question of negligence in those particular cases, a scientific exposition of the subject under consideration is obviously necessary; but when the reason for the rule ceases the rule itself ceases."

In Gunning v. Cooley, supra, the U. S. Supreme Court noted that the dissenting justice of the Court of Appeals in Gunning v. Cooley, 58 App. D. C. 304, 30 F. (2d) 467, 470, "found in the evidence 'no basis whatever for the verdict and judgment.'" Indeed that dissenting justice said that "the jury ought not to have been permitted to guess away the reputation and money of this physician." Also that "the profession of medicine will become hazardous if judgments such as this are to be sustained." Nevertheless, it held, as hereinbefore quoted, that the evidence was sufficient.

It is true that this imposes the responsibility upon jurors and trial judges of seeing that those who practice the healing art are not made the victims of perjured testimony from designing patients. On the other hand, one who is, in fact, the victim of negligence, where it is not a question of lack of professional skill or knowledge, but of carelessness, should not be deprived of her right to damages because she cannot name the fluid which blinded her, nor because she cannot procure the testimony of medical experts, that beyond any peradventure of doubt the eye through which she could formerly see clearly was scarred as a result of the application of a named medicine. The possibility of injustice is great either way.

Appellant calls attention to the decision of this court in Feltman v. Dunn, 52 S. D. 187, 217 N. W. 198, 200, wherein we say:

"In order to hold a physician or surgeon liable in damages in this class of cases, it is necessary to show that the condition complained of must have resulted from the negligent or unskillful conduct of himself or of others acting under his direction. * * * " The facts of Feltman v. Dunn, supra, are very unlike the facts in the case at bar. The same is true of the facts in all cases cited in Feltman v. Dunn. Indeed the case at bar belongs to an entirely different class of malpractice cases if indeed it may properly be called a malpractice case. There is no contention that Dr. Hill is not a skillful specialist, nor that he was guilty of any error of judgment in his treatment of respondent's eye, nor is he charged with failure to cure an ulcer. He is charged with having caused or aggravated an ulcer through his assistant having flooded the eye with some liquid, possibly tincture of iodine, but different from the liquid intended to be put into the eye, whereby the patient, who theretofore could see clearly, has now an obstructed vision.

Shelton v. Hacelip, 167 Ala. 217, 51 So. 937, also cited by appellant, has points of similarity to the case at bar. That case was three times reviewed by the Alabama court. The last time the court said, 199 Ala. 535, 74 So. 950, 951: "That the exculpation of defendant is so overwhelming and so complete that a verdict for plaintiff could be grounded only upon gross prejudice or palpable misunderstanding or ignorance." Such language when applied to the testimony in the case at bar would be at least extravagant, even though one reading the record may not be entirely convinced that respondent gave an unprejudiced and dispassionate account of the events of September 17th. There was sufficient competent evidence to satisfy the jury that respondent was entitled to damages. The trial court which heard the testimony and saw the witnesses denied the motion for judgment notwithstanding the verdict and denied the motion for new trial made by counsel who, ably and vigorously, tried the case. We find no prejudicial error in the record.

The judgment and orders appealed from should be, and they are, affirmed.

POLLEY, P. J., and CAMPBELL, ROBERTS, and WARREN, JJ., concur.

RUDOLPH, J., disqualified and not sitting.