Patricia **KOENIGUER**, Personal Representative of the Estate of Winnifred Scoblic, Deceased, Plaintiff and Appellant,

v.

**J.A. ECKRICH, Jr., M.D., C.J. Kom, M.D., and Dakota Midland Hospital, a South Dakota Corporation, Jointly and Severally, Defendants and Appellees.**

No. 15869.

Supreme Court of South Dakota.

Considered on Briefs Feb. 19, 1988.

Decided April 27, 1988.

---

William A. Bowen of Rice & Bowen, Aberdeen, for plaintiff and appellant.

Carleton R. Hoy and James L. Hoy of Hoy & Hoy, Sioux Falls, for defendant and appellee Dakota Midland Hosp.

SABERS, Justice.

Patricia Koeniguer (Koeniguer) appeals a summary judgment in favor of Dakota Midland Hospital (Hospital). We reverse and remand.

*Facts*

Winnifred Scoblic (Scoblic) consulted Dr. Eckrich about incontinence problems. Dr. Eckrich recommended surgery and Scoblic entered Hospital on January 3, 1983. An operation was performed on January 5th. Scoblic remained hospitalized until January 16th. Hospital records indicate she had a fluctuating temperature for some time prior to discharge and that her temperature was 100.2 degrees Fahrenheit on the morning of the day of her discharge. Hospital records indicate that Scoblic's temperature was recorded (if not taken) at 8:15 a.m.—after the treating physician made his rounds. Hospital and Dr. Eckrich contend that her temperature was taken prior to the physician's arrival at 7:30 a.m. and that the physician was aware of the elevated temperature and concluded that it was a normal reaction to surgical implants.

Scoblic was readmitted to Hospital on January 19, 1983 because of severe abdominal pain and fever. The diagnosis was sepsis (infection). She was transferred to the University of Minnesota Hospital on January 21, 1983 and died on March 6, 1983 of multiple organ failure.

Koeniguer, as personal representative of her mother's estate, initiated a medical malpractice action against Hospital and treating physicians, alleging departures from the appropriate standards of care. After some discovery, Hospital moved for summary judgment, which was granted.

## 1. WAS SUMMARY JUDGMENT TO HOSPITAL PROPER?

"Summary judgment is authorized only when the movant is entitled to judgment as a matter of law because there are no genuine issues of material fact. SDCL 15–6–56(c); *Trapp v. Madera Pacific, Inc.*, 390 N.W.2d 558, 564 (S.D.1986) ... [citations omitted]." *Bego v. Gordon,* 407 N.W.2d 801, 803 (S.D.1987). The moving party has the burden of proof and the "evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party." *Groseth International, Inc. v. Tenneco, Inc.,* 410 N.W.2d 159, 164 (S.D.1987), *citing Wilson v. Great Northern Railway Co.,* 83 S.D. 207, 157 N.W.2d 19 (1968) and *Trapp, supra.* Therefore, the pleadings, affidavits, depositions, and every reasonable inference arising therefrom must be viewed most favorably toward the nonmoving party. *Trapp, supra* at 562. Summary judgment is an extreme remedy and is appropriate to dispose of legal, not factual issues. *Trapp, supra; Bego, supra* at 804. Finally, we are not bound by the factual findings of the trial court and must conduct an independent review of the record. *Trapp, supra, citing Hurney v. Locke,* 308 N.W. 2d 764, 767 (S.D.1981).

> A hospital is liable to its patients for negligence only where there is a causal connection between the hospital's negligence and the patient's injury. Causation, or proximate cause, depends upon proof that the plaintiff's injury was in fact caused by the hospital and that injury to the plaintiff was foreseeable. The plaintiff has the burden of proving causation in a malpractice action and generally must present expe[r]t testimony to meet this burden.

4B Personal Injury—Actions, Defenses, Damages, "Hospitals and Asylums," § 1.02[2] (1983). "In most jurisdictions, expert testimony is required to establish the fundamental elements of the plaintiff's malpractice action—standard of care, breach, and causation." *Id.* at § 1.02[3].

In addressing standards of care for hospitals, we have said that patients have a right to expect treatment by a hospital will be "commensurate with that available in the same or similar communities or in hospitals generally." *Fjerstad v. Knutson*, 271 N.W.2d 8, 12 (S.D.1978). However, we have also cited with approval the words of the Iowa Supreme Court in *Dickinson v. Mailliard*, 175 N.W.2d 588 (Iowa 1970):

> It is no longer justifiable, if indeed it ever was, to limit a hospital's liability to that degree of care which is customarily practiced in its own community.... Adherence to such a rule, then, means the hospital whose conduct is assailed is to be measured only by standards which it has set for itself.

*Shamburger v. Behrens*, 418 N.W.2d 299, 306 (S.D.1988).

■ In malpractice actions against hospitals, where negligence by nursing personnel is alleged, the focus is: "Did the nurse provide reasonable care and exercise professional judgment under the circumstances?" 4B Personal Injury at § 1.03[2][a].

Referring to standards published by the American Nurses Association and various general nursing practice treatises, Koeniguer's expert witness, Sharon G. Van Riper, stated that in her opinion the actions of the nursing staff at Hospital did not meet acceptable standards of care for post-operative urological patients such as Scoblic. Specifically, Van Riper testified in her deposition that Hospital's nurses failed to adequately monitor Scoblic's condition and provide acceptable post-operative care by:

1) failing to document that Scoblic's elevated temperature on her day of discharge was reported to the physician;

2) allowing Scoblic to be discharged with an elevated temperature;

3) failing to instruct Scoblic about monitoring her temperature; and

4) failing to document that the condition of and drainage from Scoblic's incision was reported to the physician.

■ Koeniguer presented evidence of standards of care and evidence amounting to a breach of those standards. Hospital argues that Koeniguer has failed to show Hospital's alleged negligence was the proximate cause of Scoblic's discharge from Hospital and that any premature discharge was the proximate cause of her ultimate injuries. Hospital contends that the decision to discharge a patient is a medical determination made at the discretion of the attending physician. However, Hospital's Director of Nursing, Mary Alice Bailey, in her deposition, stated that there are times, such as when there has been a significant change in the patient's condition, when it is the nurse's responsibility to question the physician's order. She confirmed Van Riper's assertion that the nurse has a duty to communicate changes in the patient's condition to the physician and "go further" if her concerns are not sufficiently or appropriately answered by the physician. Hospital disputes that the standard of care for nurses requires them to independently evaluate the patient's condition, discuss their concerns with the physician, and go to other authority if they believe the physician's decision is in error, but expert testimony to that effect appears in the depositions. These questions are for the jury.

■ There is expert testimony in the record that the nurses had a duty to attempt to delay Scoblic's discharge if her condition warranted her continued hospitalization. This advocacy role of the nurse was neglected. There is no evidence that anyone questioned or disagreed with the physician's decision to discharge, so Scoblic was discharged. Negligence can be premised equally upon an omission to act as upon the commission of an act.

■ Viewing the evidence most favorably to the nonmoving party, the element of causation has been established. It can reasonably be inferred from evidence in the record that the delay in treatment resulted in Scoblic being readmitted to the hospital in a more serious condition than she would have been had she been treated three days earlier. There is contradictory expert testimony as to whether the surgery, the infection or a combination of the two resulted in Scoblic's death. For summary judgment purposes Hospital had the burden and did

not demonstrate that the physician's alleged negligence superceded any negligence by Hospital and was the sole proximate cause of Scoblic's death. A jury will have to make that factual determination. *Groseth, supra; Trapp, supra; Wilson, supra.*

We reverse and remand for trial.

MORGAN and MILLER, JJ., concur.

HENDERSON, J., concurs specially.

WUEST, C.J., dissents.

HENDERSON, Justice (specially concurring).

Hospital's breach of standards, plaintiff alleges, pertains to standards of "hospitals generally," which is a safe pleading under this Court's holding in *Fjerstad,* 271 N.W. 2d 8. More specifically, the negligence alleged is that the hospital failed to properly monitor the decedent's (Mrs. Scoblic's) condition and to provide her with adequate post-operative care. According to the plaintiff/representative of the estate of Mrs. Scoblic, the patient was prematurely released from the hospital with an infection and the hospital failed to check on her temperature, *inter alia,* leading to a negligent dismissal from the hospital and her ultimate death.

Appellant/Plaintiff employs the expert testimony of a nurse-educator, owner of a consulting business, and assistant head nurse at the University of Michigan Hospital, one Sharon Van Riper; also, appellant relies upon statements of Mary Alice Bailey, vice president of nursing at Dakota Midland Hospital. Appellant's showing further includes statements of one Kathy Padgett, a nurse who took Mrs. Scoblic's temperature on the morning of January 16, 1983, and Sharon Kost, a nurse who was on duty when the decedent was discharged. There is an abundance of facts and expert opinion contained in the record. This is a negligence action. Summary judgments are, generally speaking, not feasible in negligence actions, the reason being that the standard of "the reasonable man" must be applied to conflicting testimony, such as we see exhibited in the showings below. *Accord: Laber v. Koch,* 383 N.W.2d 490, 493 (S.D.1986); *Lalley v. Safway Steel Scaffolds, Inc.,* 364 N.W.2d 139 (S.D.1985). We are confronted with "standards" in this case. We must think standards. In *Nemec v. Deering,* 350 N.W.2d 53, 56 (S.D. 1984), we held: "'A genuine issue of fact exists where, on the basis of facts in the record, reasonable minds could differ on whether defendant's conduct measures up to the required standard.'" *Id.* (citation omitted). It is my opinion that reasonable minds could differ on the hospital's conduct on "the required standard," if judged by its own standard or standards of "hospitals generally" or hospitals in "similar communities" or comparable hospitals in other communities, outside of the State of South Dakota.

It appears to me, from reading the briefs and the cases cited, that plaintiff-appellant is claiming a violation of the national standards of nursing care. More specifically, it would further appear that the hospital's alleged negligence is argued to be, in the alternative, the following:

(1) Failing to document that decedent's elevated temperature was reported to her physician;

(2) Permitting the decedent to go home;

(3) Failing to instruct the decedent to take her own temperature; and

(4) Failing to document that a condition of both redness and drainage, existing at the decedent's incision, was reported to her attending physician.

This decision is an important one to our state and particularly to all hospitals and nurses who work therein, and has significant ramifications for their procedures and responsibility. As a life-long citizen of this state who has had superb care by hospitals and nurses, and who holds them in the greatest respect, my responsibility is very great to see that justice is done, not only in this particular case, but in the future. It is known that nurses, nationally, are greatly underpaid and overworked. Recent national television and Associated Press articles have called the nation's attention to "strikes." Further, television features

have informed us that there is a severe shortage of nurses which imperils the nation's health.

A life is so often in a nurse's hands when the doctor is not in attendance. Nurses are not, however, licensed to practice medicine. They are not the ultimate decision-makers in terms of the patient's care; rather, they are the decision-implementers. Therefore, the statement in the majority opinion that nurses have an "advocacy role," is very difficult for me to accept.[1] Nurses are not authorized to write discharge slips for patients and they are not to second-guess a physician's decision to discharge. *See J. Smith, infra.* However, as I shall explain below, they do have certain duties with respect to patients and discharge which demands of them a certain standard to which they must adhere. Were nurses to get into an advocacy role and to question the orders of doctors by which their statements were taken to superiors and to other doctors, they would soon lose their job or create extreme professional friction, if not pandemonium, in the hospital. So, a nurse should not be required to be a practicing physician and make an independent evaluation to then question a doctor's decision. It is a medical determination and not a nurse's determination to discharge a patient, *see* J. Smith, *Hospital Liability,* § 9.01 (1987); A. Southwick, *The Law of Hospital and Health Care Administration,* p. 177 (1978). Per the testimony of plaintiff's nurse expert, Van Riper, it is doctors, and not nurses or hospitals, who ultimately bear the decision of discharging patients. Discharging the patient in this case, with an elevated temperature, is a crucial reflection/consideration in the case at hand.

Extraordinary circumstances can exist, spawning an exception to the general rule, by which a hospital can be charged with a duty to contravene a discharge order. J. Smith, *Hospital Liability,* § 901. A threshold determination arises: Did such an extraordinary circumstance arise in this case? This fact should be fully explored at a trial.

I wish to devote one paragraph to this simple statement: (1) Mrs. Scoblic died of multiple organ failure resulting from medically unmanageable sepsis; and (2) she had sepsis when she was discharged. These two facts are inescapable; they are not hypotheses.

Elevated temperature in a patient is a common sign of infection, as established by the showing below. A perforated colon and leaking urine appears to have been the cause of infection, plus internal implanted splints, per all of the medical testimony herein. Infection is a danger sign to the well-being of any patient, medical testimony reflects. A question of fact surely arises as to the professionally imprudent discharge of Mrs. Scoblic, considering her condition.

Facially, as depicted by the record, there appears to be improper *charting* of decedent's temperature by the nurses. And if there was no absolute appearance of improper charting, there is certainly a question of fact posed by the plaintiff's showing herein. Charting is a *hospital* function. A nurse is a conduit for these helpful, vital, and historic charts.

Suggestion in the record also exists, or appears to exist, of inadequate *monitoring* of the patient's temperature. I am convinced that a question of fact arises in this connection, also.

This brings us to another important facet of Mrs. Scoblic's care in the hospital: Was the *doctor timely advised* of the elevated temperature by the nurses?[2] A reading

---

1. Calling to the doctor's attention that the patient has a "complication," would not be donning an advocacy role (in my opinion). Expert Van Riper testified: "Doctors assume that nurses will report to them when a patient has a complication. That is part of the nurse's job." Van Riper Deposition, at 15.

2. This particular hospital's guidelines required temperatures to be taken four times a day. Nurse Kost testified that Mrs. Scoblic's temperature was not taken after night personnel (nurse in charge) took vital signs at 7:00 a.m. Therefore, it may safely be assumed that a temperature reading was not taken of Mrs. Scoblic between at/about 7:00 a.m. to 10:45 a.m. This hospital's standards (*i.e.,* its own procedure) was

herein suggests otherwise—but again—a question of fact arises. Given the elevated temperature of decedent, I am sorely troubled that between 7:30 a.m. and 10:45 a.m. (the latter being the time decedent was discharged), the nurses did not *communicate* with the doctor; if I have mistaken the showings herein, I am absolutely convinced that there is a factual question for a jury concerning *communication* with the doctor during that approximate three-hour period of time when the decedent was apparently having serious post-operative problems.

A question of fact for the jury also arises when Dr. Steinhardt, expert for decedent's estate, testified that this lady should not have been discharged with a temperature and that something was definitely wrong, for she displayed a septic spiking. Diagnosing sepsis, per Dr. Steinhardt, a medical expert, is very critical so that an effort is immediately made to correct the situation. In more laymanistic terms, once an infection is diagnosed, it has to be treated as soon as possible, or a bad situation becomes a dangerous situation for the patient. Therefore, as established by medical expert testimony below, a follow-up procedure of (a) charting (b) monitoring (c) timely advising the doctor and (d) taking the temperature during this approximate three-hour period and immediately antecedent to discharge appears to have been highly necessary, if not critical, to the health of this seriously ill lady. Reasoning of the experts, per showing below: Such procedures can check upon and ultimately lead to the immediate response and correction of a serious infection.

As mentioned above, this is a negligence case. Therefore, to prevail herein, the personal representative of the estate of Mrs. Scoblic must establish three necessary elements of *actionable negligence:* (1) A duty on the part of defendant; (2) a failure to perform that duty; and (3) an injury to the plaintiff resulting from such a failure.

*Leslie, infra.* Said personal representative, as hospital's counsel has strenuously advocated, must go one step further to support a *recovery in negligence* which may be denominated a fourth element herein: Hospital's act or acts or conduct must have proximately caused the plaintiff's injury. *Leslie, infra.* With reference to the latter element, expert testimony must establish Mrs. Scoblic's deteriorating condition or injuries or bodily hurt. *Magbuhat v. Kovarik,* 382 N.W.2d 43, 46 (S.D.1986). *See also In re Schramm,* 414 N.W.2d 31 (S.D.1987), although the latter case applies to a dentist and not the standard of care of a hospital. The gentlemen who try the facts of this case, as well as the trial judge, should bear these four elements in mind during the progress of this case. I am acutely cognizant that counsel for the hospital has vigorously, and ably, contended that there is no causal connection between nursing errors and the deteriorating health of Mrs. Scoblic. Furthermore, I am keenly aware that hospital's counsel is adamant in their position that no expert testimony establishes a causal nexus between defendant's alleged violation of standards and proximate cause of plaintiff's injury. Within the confines of all proofs adduced herein, I harbor a conviction, hoping that it is not grievously faulty, that there is a prima facie probability [3] that a harm resulted from some negligence for which defendant was responsible; and that it is not necessarily in consequence of something for which the hospital was not responsible. In *Lohr v. Watson,* 68 S.D. 298, 2 N.W.2d 6 (1942), we find this language:

> In negligence cases and especially in malpractice cases, proof of causal connection must be something more than consistent with the plaintiff's theory of how the claimed injury was caused. *The burden is on plaintiff to show that it is more probable that the harm resulted from some negligence for which defendant was responsible than in consequence of*

to *not* repeat vital signs immediately before a patient was released. Kost Deposition, at 65–66.

**3.** Degree of proof established in *Thomas v. St. Mary's Roman Catholic Church,* 283 N.W.2d

254, 258 (S.D.1979), establishing the standard of reasonable medical probability vis-a'-vis reasonable medical certainty.

*something for which he was not responsible.*

*Lohr,* 68 S.D. at 303, 2 N.W.2d at 8 (quoting *Yates v. Gamble,* 198 Minn. 7, 14, 268 N.W. 670, 674 (1936)). Again, it appears to me even under the holding of *Lohr,* that a question of fact exists. In writing *Leslie v. City of Bonesteel,* 303 N.W.2d 117 (S.D. 1981), over seven years ago, for this Court, I took comfort in past holdings of this Court. I was concerned there, as in the present case, with the proximate cause consideration. *Leslie* has been cited with approval, oft-over, by this Court and I refer to *Leslie,* 303 N.W.2d at 119, pertaining to the several authorities and definitions of "proximate cause." In digesting the volume of those authorities and quotes therefrom, I am academically struck with the premise originally expressed in *Engberg v. Ford Motor Co.,* 87 S.D. 196, 202, 205 N.W.2d 104, 107 (1973), and *Parham v. Dell Rapids Township in Minnehaha County,* 80 S.D. 281, 122 N.W.2d 548 (1963): That a case, to establish liability, need not be proven to a degree of absolute certainty. A trial judge, who is evaluating the evidence, must consider if the harm was a foreseeable consequence of the complained act.

> The term "proximate cause" contemplates an immediate cause which, in natural or probable sequence, produces the injury complained of. This excludes the idea of legal liability based on mere speculative possibilities or circumstances and conditions remotely connected to the events leading up to an injury.

*Leslie,* 303 N.W.2d at 119 (quoting *Mulder v. Tague,* 85 S.D. 544, 549, 186 N.W.2d 884, 887 (1971)). With the plethora of evidence presented, it is at least a question of fact on the proximate cause. Evidence has been established that it does appear that Mrs. Scoblic's deteriorated condition was not "mere speculative possibility" (*Leslie, Mulder*) or a "condition remotely connected" (*Leslie, Mulder*) to the event leading up to her failing condition, which ultimately proved fatal. Therefore, I would also reverse the summary judgment granted by the trial court.

WUEST, Chief Justice (dissenting).

I dissent. In my opinion there is not sufficient evidence in the record to infer the claimed negligence of the hospital was a proximate or contributing cause of Scoblic's death.

It is well-settled law in South Dakota that negligence in medical malpractice cases must be established by the testimony of medical experts unless the subject of the testimony is "within the common knowledge and comprehension of persons possessed of ordinary education, experience and opportunity." *Magbuhat v. Kovarik,* 382 N.W.2d 43, 46 (S.D.1986). *See Carlsen v. Javurek,* 526 F.2d 202, 207–08 (8th Cir. 1975); *Appeal of Schramm,* 414 N.W.2d 31, 36 (S.D.1987); *Van Zee v. Sioux Valley Hospital,* 315 N.W.2d 489, 492 (S.D.1982); *Block v. McVay,* 80 S.D. 469, 474, 126 N.W.2d 808, 810 (1964) (overruled in part on other grounds in *Shamburger v. Behrens,* 380 N.W.2d 659 (S.D.1986)); *Hansen v. Isaak,* 70 S.D. 529, 533, 19 N.W.2d 521, 522–23 (1945); *Myrlie v. Hill,* 58 S.D. 330, 336–337, 236 N.W. 287, 290 (1931); *Kelley v. Hollingsworth,* 44 S.D. 23, 29, 181 N.W. 959, 961 (1921). The expert testimony requirement applies not only when establishing alleged deviations from the standard of care, it also applies when proving the essential element of causation. *Lohr v. Watson,* 68 S.D. 298, 2 N.W.2d 6 (1942). *See Podio v. American Colloid Co.,* 83 S.D. 528, 162 N.W.2d 385 (1968); *Howe v. Farmers Cooperative Creamery of Madison,* 81 S.D. 207, 132 N.W.2d 844 (1965); *Campbell v. City of Chamberlain,* 78 S.D. 245, 100 N.W.2d 707 (1960); Annot., 13 A.L.R.2d 11, 31 (1950); 61 Am.Jur.2d, *Physicians and Surgeons* § 348 (1981).

Here, while plaintiff proffered expert testimony arguably establishing a potential deviation from the standard of care, plaintiff has not offered any testimony, expert or otherwise, substantiating a causal relation between the alleged breach of duty by the hospital and Mrs. Scoblic's ultimate injuries. Mrs. Scoblic died of multiple organ failure brought on by "medically unmanageable" sepsis. Given the nature and

complexity of the diagnostic tests and surgical procedures performed, the magnitude of complications which could arise, the number of actors involved, and the vast array of factors which may have contributed to Mrs. Scoblic's failing condition, it cannot be said that laymen, unassisted by the aid of medical and scientific knowledge, would be qualified to determine the proximate cause of Mrs. Scoblic's death.