Sharon REEVES, as the Guardian Ad
Litem of Toni Howe, Plaintiff
and Appellant,

v.

Scott REIMAN, Defendant and Appellee.

No. 18383.

Supreme Court of South Dakota.

Considered on Briefs Feb. 16, 1994.

Decided Oct. 12, 1994.

Rick Johnson and Stefanie Pochop of
Johnson, Eklund, Nicholson, Dougherty &
Abourezk, Gregory, for appellant.

James E. McMahon and Gregg S. Green-
field of Boyce, Murphy, McDowell & Green-
field, Sioux Falls, for appellee.

KEAN, Circuit Judge.

## ACTION

This is an appeal from an order granting summary judgment for Scott Reiman (Reiman). He had been sued by Toni Howe (Howe). The basis of the lawsuit arose out of the facts from the infamous situation at the Governor's Mansion (Mansion) in Pierre, South Dakota, on November 28, 1989. Howe brought this proceeding in February 1991, subsequent to the completion of a juvenile proceeding. The prior history of this case can be found in the Supreme Court decision of *In the Matter of Hughes County Action, No. Juv. 90-3*, 452 N.W.2d 128 (S.D.1990) and the ancillary case of *Sioux Falls Argus Leader v. Young*, 455 N.W.2d 864 (S.D.1990).

The rules for summary judgment are well known and oftentimes ruled upon in this state. In *Laber v. Koch*, 383 N.W.2d 490, 491–92 (S.D.1986) it was held that in any summary judgment hearing the evidence is viewed in favor of the non-moving party; the burden is on the movant to show there is no issue of material fact and that he or she is entitled to a judgment as a matter of law; summary judgment is not a substitute for a trial and the trial court cannot surmise who will prevail at trial; and, while the motion is an extreme remedy, when no germane material issue exists, the motion is viewed with favor. The *Laber* decision went on to note the non-moving party must present specific facts which demonstrate a genuine issue of fact for trial and pleadings do not control. *Id.* at 492. On the topic of pleadings, a party may not simply rely upon them, but must develop facts which demonstrate that a dispute in facts exists. *Lalley v. Safway Steel Scaffolds, Inc.*, 364 N.W.2d 139, 140 (S.D. 1985); *Parsons v. Dacy*, 502 N.W.2d 108, 110 (S.D.1993). Finally, it is now a recognized rule in this state, that "when the facts are not in dispute, the standards of conduct are for the court to determine." Moreover, "a party who has testified to the facts cannot now claim a material issue of fact which assumes a conclusion contrary to his (or her) own testimony." *Lalley v. Safway Steel Scaffolds, Inc.*, 364 N.W.2d at 141; *Waddell v. Dewey County Bank*, 471 N.W.2d 591, 595 n. 3 (S.D.1991).

In her complaint and amended complaint, Howe alleged these facts:

* Reiman induced Howe to accompany him to a party at the Mansion;

* Reiman was instrumental in providing her with alcoholic beverages;

* Reiman took advantage of her intoxicated condition by undressing her and having sexual contact with her;

* She was dragged around the Mansion and Reiman encouraged others to have sexual contact with her;

* Reiman made defamatory comments to the effect that she walked around the Mansion while nude and voluntarily engaged in sexual contact with others.

Although Howe does not use these words in her amended complaint, she has in essence sued for assault, slander, and intentional infliction of emotional distress. Actual and punitive damages were sought.

Reiman filed an answer. The discovery consisted of Howe's answers to interrogatories and the depositions of Howe, Reiman, and three other juvenile males who were at the Mansion on that evening. A motion for summary judgment was made on March 15, 1993, and a hearing held March 26, 1993. An oral decision was made by Judge Anderson on the day of the hearing at which he granted the summary judgment request. Reiman's deposition had not been completed and transcribed by the time this hearing occurred. However, Judge Anderson considered the Reiman deposition later and wrote to counsel on April 6, 1993: "I find nothing therein which would alter this Court's grant of summary judgment." The judgment was signed on April 7, 1993.

## FACTS

On November 28, 1989, Howe had attended school. She was at home in Ft. Pierre when Reiman called from the Mansion at about 9:00 p.m. Reiman had dated her before. He told her that some people were coming over to the Mansion and she was invited over by both another juvenile and himself. While she refused the invitation at first, she eventually relented. She did not

tell her parents she was leaving as both were asleep. Only her younger sister knew she was leaving.

Reiman arrived at Howe's home at about 10:00 p.m. From there they drove in his truck over to Pierre and drove around for fifteen minutes before they went to the Mansion. In the truck, she had a drink from Reiman's glass which contained Coke and whiskey. Upon arriving, they entered and found two of the other three males already there. After a short time the last of the four juvenile males arrived. The males began to drink and invited her to do so also. She complied and had "about six" in fifteen minutes. The record contains some conflicting testimony about whether all six drinks contained some or no whiskey. No one forced her to drink. Howe soon became sick and went to the bathroom to find some aspirin. One of the males helped her. Reiman then arrived and also began to help and soon took her upstairs where the bedrooms were located.

Howe admitted that she and Reiman began kissing in the doorway of the upstairs bedroom. After a few minutes of this activity, she told him she still needed to find some aspirin and went downstairs to find some. When she went downstairs one of the other males tried to kiss her; she resisted; he stopped. While she was downstairs, one of the males asked her to go to the basement where the liquor was kept and get another bottle. She did this and upon her return with the bottle, had another drink. Soon she and Reiman ended back upstairs in the bedroom. And, what occurred next is best described by Howe's own deposition:

Q: So you and Scott [Reiman] went upstairs then?

A: Yes.

Q: Where did you go?

A: To the bedroom by the bathroom....

Q: Just you and Scott went into that bedroom?

A: Yes....

Q: Who closed the door?

A: Scott closed the door.

Q: Tell me what happened in the bedroom.

A: We were kissing.

Q: What else?

A: We were kissing and making out and he took my clothes off me and then he took his shirt off and we sat down on the bed and we were kissing and he shut the door and he locked the door and I don't remember when ...

Q: Okay, what else happened between the two of you, anything?

A: We were kissing and making out.

Q: Did you have intercourse [with Reiman] that night?

A: No, he wasn't—no, we did not....

Q: You had all your clothes off?

A: Yes.

Q: Did he have his clothes off?

A: I don't know if he had his pants off ...

Q: That was a consensual act between the two of you? ...

Q: Did you consent to that? I mean you were up there with Scott; was he forcing you to do that?

A: No.

Q: That was something that—well, the two of you have done that before?

A: Yes.

Q: He didn't force you to stay in the room or anything?

A: No....

Q: Is that right; it was consensual between the two of you up until this point in time? ...

A: I didn't say no.

Q: Did you ever tell him you wanted to leave?

A: No....

Q: What happened after that?

A: We were kissing again for a little while and then I don't remember. I passed out.

While Howe and Reiman were in the bedroom, two of the other males came to the bedroom door and knocked. Although the record is not clear on this point, it appears that at this same time the fourth male had gone to another bedroom and had either

passed out or gone to bed. Reiman went to the door and stepped into the hallway closing the door behind him. Shortly thereafter, Howe, still naked, opened the door and came into the hallway telling Reiman she was ill. He assisted her to the bathroom across the hall and, after she entered, he shut the bathroom door. Soon he heard loud noises coming from inside as if she was falling down. When she emerged she was having trouble walking. Reiman grabbed her from behind and walked her down the hall. She was still nude at this time and this scene was observed by two other males. Reiman claimed he took her to the second bedroom, placed her on the floor (not on the bed), and covered her with a blanket. One of the other two males thought Reiman put her on the bed, not the floor. This was the same bedroom where the fourth male was now sleeping. Neither of the two males in the hallway touched Howe, but they did see her in the nude.

Reiman and the two males decided to go for a ride. Before they went, the two males went upstairs to check on Howe because she had vomited earlier. When they looked into the bedroom, they saw her in bed with the male. The two were "making out" at this time and all appeared to be consensual.

Howe does not recall a great deal after being in the bedroom with Reiman. She remembers being in Reiman's arms in the hallway and awakening when the male in bed attempted intercourse with her. She woke up and began vomiting; the male also was vomiting. She thought she recalled seeing the males in the hallway. She also recalled being in the bathroom, vomiting and waking up alone in the morning.

The next morning Howe got up, showered, and went directly to school. She did not go home because her younger sister had called and told her to go directly to school. Howe's sister had covered for her by telling the parents that Howe had gotten up and left the house early for cheerleader practice. Howe's recollection about the events of that night are very sketchy.

When Howe first woke up she began to look for her clothing in the second bedroom. Unable to find them she yelled downstairs for Reiman who told her he did not know where they were. She went to the first bedroom where she found her articles of apparel.

Howe went to school still under the influence of the alcohol that lasted most of the day. She felt sore all over and saw scratches on her feet, bruises, and broken fingernails. She talked to two of the males during the day and asked them what had occurred. Both responded by stating: "Oh, nothing, nothing bad. We drank a little and it was nothing to worry about." Howe claims she began to have more recollection of the events as the day went on. She asked the boy who had penetrated her how she got the scratches on her, and he responded that the other males (not including Reiman) had caused them.

Within hours after school started the next day, rumors began to flow through the high school student body. By the next day the rumors had spread throughout both Pierre and Ft. Pierre concerning the events of the prior day—some of them true, some embellished by the rumors themselves.

1.

DEFAMATION

■ Slander is part of defamation. Slander is defined as "a false and unprivileged publication, other than libel," which:

(2) Imputes to him [or her] the present existence of an infectious, contagious, or loathsome disease; or

\* \* \* \* \* \*

(4) Imputes to him [or her] impotence or want of chastity.

SDCL 20–11–2 and 20–11–4.

Apparently Howe heard the rumors at the local high schools which by then were running rampant throughout the Capitol City area. Yet, Howe is not very specific about the nature of the rumors, the content of the rumors, the source of the rumors, or who started the rumors. She was called some names at school and students were pointing at her. Similar things occurred that night at a high school basketball game. While certainly upsetting, Howe does not plead any facts which set forth either the falsity of the

statement nor their source being Reiman. There are a few general references in her deposition which tied her into the party the day before, but she does not relate where these statements came from, and more to the point, how Reiman either stated the rumors or repeated them. Not even an affidavit in resistance to the motion for summary judgment was filed in this regard. Upon the state of the record, the trial court was correct in dismissing any allegations of slander for basically, Howe has not even shown the rumors were false. *Tibke v. McDougall*, 479 N.W.2d 898 (S.D.1992) (failure to raise issue of falsity fatal to claim for slander). In *Miessner v. All Dakota Ins. Assoc.*, 515 N.W.2d 198, 203–204 (S.D.1994), this Court held "both libel and slander require that [the plaintiff] prove that the Defendants made a 'false and unprivileged publication.'" Moreover, when the plaintiff "failed to set forth specific facts which create a genuine issue of material fact. . . . Summary judgment was proper." *Id.* at 204. Howe in her complaint alleges that Reiman told others she was walking around the Mansion while nude and had others touch and have sexual contact with her. Yet, there is no evidence by Howe in resistance to the motion that Reiman told anyone anything.[1] Mere allegations in the complaint are not adequate to support the denial of the request for summary judgment once the motion is made. *Lalley v. Safway Steel Scaffolds, Inc.*, *supra.*

2.

## ASSAULT

■ Howe claims she suffered a civil assault at the hands of Reiman. In a cause of action the victim need not show a specific intent or design to cause the contact or to cause any singular and intended harm. What is forbidden is the intent to bring about the result which invades another's interests in a manner that the law forbids. *Frey v. Kouf*, 484 N.W.2d 864, 867 (S.D.1992). The victim has to show that the actor

(a) [intended] to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and,

(b) an offensive contact with the person of the other directly or indirectly results.

Restatement (Second) of Torts § 18.

Germane to the question of a battery is consent. In Restatement (Second) of Torts § 892 consent is defined as a "willingness in fact for conduct to occur." Section 892A then goes on to discuss the effect of consent.

(1) One who effectively consents to conduct of another intended to invade his (her) interests cannot recover in an action of tort for the conduct or for harm resulting from it.

In defining the word "effectively," the *Restatement* continues by stating:

(2) To be effective, consent must be (a) by one who has the capacity to consent
. . .

So there is no question in future cases in this state, a person who touches another in an offensive manner is liable for a battery. If a male touches a female on her breasts or genitalia or buttocks or kisses her without her consent, he is subject to a civil action for battery regardless of how well intentioned. Had such conduct occurred in this case, Reiman would be subject to an action for assault

---

1. The concurrence in part, dissent in part focuses on two points which need clarification. The first point is that part of the writing which states: "Reiman was the only one who could have started some of these rumors." There is no factual reason given for this conclusion. There were actually four males in the mansion. Reeves, who bears the burden to show some evidence as to who began the false rumors, has never put forth any evidence that Reiman told anyone about what occurred in the mansion, let alone that he told false stories. If anything, the stories were palpably true. But this goes to intentional infliction of emotional distress, not defamation.

The writing continues by proclaiming that Reiman admitted he made false statements. What occurred, actually, went along these lines. When Reeves told her mother of this incident, the police were called. The police conducted an initial interview with Reiman. Here he gave the police misinformation about what occurred. When the police came back better armed with the facts, he (Reiman) admitted he did not tell the truth to the police the first time. Telling the police the wrong story may be stupid, it may get you into trouble, it might get you charged with a crime, but it is not a publication which supports defamation. And that is what Reiman was referring to on page 13 of his deposition, not that he told "others" false stories about Reeves.

and any resulting damages caused by his conduct. But, the essence of this case lies not in determining whether Reiman touched Howe, but in whether she consented to his touching. Reiman admits the contact. Howe facially concedes the consent:

Q: I mean you were up there with Scott; was he forcing you to do that?

A. No.

Q: Is that right; it was consensual between the two of you up until this point in time? ...

A. I didn't say no.

■ The next point is whether she had the capacity to consent. On this aspect there are several points to remember. One is that Howe was not a novice to consuming alcohol. She had done it before and knew its effects even though she had not drunk as much before. The next fact is that she had dated Reiman before and had consumed alcohol with him. Further, she voluntarily left her home that night and consumed alcohol in Reiman's pickup truck while they drove around Pierre before they went to the Mansion. At no time did Reiman hide the fact that he was serving her alcohol. On the other hand there is a factual disagreement over how much Howe had to drink. The males stated she had a few practice drinks with little or no alcohol before she began to drink heavily right before she passed out. The amount of liquor is also in dispute ranging from several shots in a glass each time to a full glass of liquor. There is a dispute whether Howe knew how much liquor was in each glass. Moreover this Court has to keep in mind that this was a juvenile, and while not a novice, a factual issue has been raised as to whether she was given liquor so she would be unable to give consent. The problem revolves around the central problem of her mental capacity to give consent and whether this was overborne by Reiman's conduct alone or in concert with others. If a jury would determine that her consent was given, then no recovery can be made.

And again, there is the unresolved issue dealing with the scratches, bruises, and other hurt Howe suffered. None of the males deposed know anything about it although after Howe passed out they were the only ones who had contact with her. But the state of the facts shows she probably got these after she passed out, thus, something she did not consent to. We are not unmindful that only Reiman has been sued. But, according to the criteria in Restatement (Second) of Torts § 18(a), intent to cause harmful or offensive contact with a third person may be the basis of personal liability. Matters are genuinely in dispute as to the nature and extent of the consent and the facts under which it was given.

### 3.
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ The final aspect of Howe's case centers upon a claim that Reiman intentionally inflicted emotional distress upon her. For this cause of action four elements are needed to establish a prima facie case:

1. An act by defendant amounting to extreme and outrageous conduct;

2. Intent (or recklessness) on the part of the defendant to cause plaintiff severe emotional distress;

3. The defendant's conduct was the cause-in-fact of plaintiff's distress; and

4. The plaintiff suffered an extreme disabling emotional response to defendant's conduct.

*Tibke v. McDougall*, 479 N.W.2d at 906; *Nelson v. Web Water Development Ass'n, Inc.*, 507 N.W.2d 691, 698–99 (S.D.1993); *Bass v. Happy Rest, Inc.* 507 N.W.2d 317, 321–324 (S.D.1993); *Petersen v. Sioux Valley Hosp. Ass'n*, 491 N.W.2d 467, 469 (S.D.1992) (tort of intentional infliction of emotional distress includes reckless behavior). *See generally,* Annotation, Modern Status of Intentional Infliction of Mental Distress As Independent Tort; "Outrage," 38 A.L.R. 4th 998 (1985). The outrageous conduct which gives rise to the tort "must be conduct which exceeds 'all bounds usually tolerated by decent society and which is of a nature especially calculated to cause, and does cause, mental distress of a very serious kind.' ... The initial determination of whether the defendant's conduct is extreme enough to permit recovery belongs to the trial court." *Tibke v. McDougall*, 479 N.W.2d at 907.

As outrageous conduct Howe submits these factors:

\* Reiman invited and took Howe to an unchaperoned party where he provided her with and encouraged her to guzzle drinking glass shots of Lord Calvert.

\* Reiman observed that Howe was intoxicated, then undressed her and had sexual contact with her himself while she was in that state.

\* While she was nude and only partially conscious, Reiman brought her out into the hallway of the Mansion in front of two of his friends, allowing both of them to freely observe her nude body.

\* Reiman took Howe to the bathroom while she was in this state and even requested that his two friends come help him because Howe could not sit by herself.

\* While the two other friends were present, Reiman then pulled or "assisted" Howe, still nude, down the hallway into the bedroom of another friend and left her there in a passed out condition so that he could go drive around. Reiman knew that his friend had sexually transmittable body lice. Reiman's friend and Howe were later seen in the bed, "making out."

\* The following morning, Toni asked Reiman what happened to her and he told her, "Oh, nothing. It was just a small little get-together. We drank a little bit and it was nothing to worry about." He and his friend immediately discussed their experiences with her that night, and he later told investigators that his friend had admitted to penetrating her manually. He testified later that he had been lying to the investigators, his attorney and the special prosecutor.

· \* Reiman later observed his friend having sexual contact with her and did nothing to stop it even though he knew that she was very intoxicated and that he had body lice.

\* There is a conflict in the evidence about whether Reiman put Howe on the floor or directly in his friend's bed.

On the foregoing factual representations, much discussion could ensue all the way from commentary upon the conduct of a group of teenagers whose actions were unbridled and uncaring to queries about the mores of juveniles in our present day society. Our inquiry also might focus upon the extent to which the judicial system should protect a person against her own faults and failures and damage caused by another in contrast to the need of a person to make errors and mistakes as part of the maturation process of life.[2] Had the activities of this evening ended when Reiman and Howe were alone in the bedroom, it is questionable whether a claim for damage could survive a summary judgment challenge. As we have noted earlier Howe left her home of her own volition. She left because of an invitation from Reiman. She drank liquor voluntarily. She engaged in sexual contact with the consent being disputed. Even some of the events which transported later do not give rise to a cause of action. The depositions are clear that Howe initially came to the bedroom door herself and needed help to the bathroom. Reiman gave her this help. It was not a plan, as claimed by Howe, to expose her in her nude state to two other males in the hallway. She was sick from liquor and needed to use the bathroom.

■ However, beyond this, the next series of events does seem to enter that area defined as "extreme and outrageous conduct." And the conduct this Court now refers to is when Reiman took Howe, not back to the same bedroom from where she came, but took her farther down the hall and either put her while nude on the floor or in bed with another male. When Reiman looked into this second bedroom at a later time, Howe was in the bed with this male. Sexual inter-

---

**2.** The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiff must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsider-

ate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.... Restatement (Second) of Torts, § 46, Comment d.

course occurred. While there might be consent between Reiman and Howe, an issue certainly arises about consent between Howe and the male. Howe may have put herself into the situation with Reiman on a voluntary basis. But, her consent to drink and engage in activities with Reiman is not a transferable consent; at least at this posture she denies it was and has also claimed she did not consent to the intercourse.

While the cause of action addressed is in very encompassing language, the case law has developed some parameters. In *Ruple v. Brooks,* 352 N.W.2d 652, 654–658 (S.D.1984) this court held that a man's obscene phone calls to a woman was outrageous conduct. Two years later in *Ruane v. Murray,* 380 N.W.2d 362, 364 (S.D.1986), in reversing an order granting summary judgment, this Court held that extreme and outrageous conduct arose from a male landlord's conduct when he made sexual advances towards a female tenant knowing she was psychologically incapable of resisting these demands. Thus, if words are outrageous, would conduct which put a person (while intoxicated) into the position of being sexually used by another not also be outrageous?

The appellant in *Leaon v. Washington County,* 397 N.W.2d 867, 873 (Minn.1986) convinced the Minnesota Supreme Court that the action he was subjected to qualified for the tort of intentional infliction of emotional distress. It was a situation where one person had been involuntarily put into a position where another had sexual contact with him. Leaon had gone to a stag party for a co-worker who was to be married, but arrived late after the party was in full swing. Once inside he was taken to the stage where he was forced to lie down on his back with a dollar bill in his mouth. A nude, female dancer touched her vagina to his face and, with her hand, removed the dollar bill. "Humiliated and much distressed, Leaon left the party soon afterwards." *Id.* at 869.

The trier of fact could find that the incident at the stag party was outrageous and intentional (or reckless), and also, perhaps,

that the incident caused at least Donald Leaon severe emotional distress.

*Id.* at 873.

Especially pertinent to this case is the following language in Comment d of the Restatement (Second) of Torts, § 46:

Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

We conclude that Reiman's conduct is extreme enough to permit this matter to be presented to the jury. *Nelson v. Web Water Development Ass'n,* 507 N.W.2d at 698. And, because of this conclusion, we are compelled to reverse, in part, the decision of the trial court in granting summary judgment. We have previously concluded that the matter of the assault and whether a consent occurred should also be submitted to a jury for a decision. As guidance to the trial court upon remand, we note that there is a distinction between false statements which are the basis of defamation and statements which, although true, are the basis of the tort of outrageous conduct. All conduct flowing from the outrageous conduct, even the repeating of the events, can constitute a basis for damages. It would do little to deter outrageous conduct if the actor could broadcast his activities with impunity. However, it must first be established that the conduct was in fact outrageous and the actor was the person who published these activities to others before damages may be awarded against the actor for the publication. His damages should be limited to his conduct; he is not an insurer for the conduct of others. And, it should be kept in mind that the publication of the conduct is not the basis for the damages. Rather the basis for Howe's damages must lie in her proof of what disabling emotional response she directly suffered from Reiman's total conduct. *See, Tibke v. McDougall,* 479

N.W.2d at 906 and the cases cited previously in this opinion.

This case is affirmed in part and reversed in part and remanded for further proceedings.

MILLER, C.J., AMUNDSON, J., and HENDERSON, Retired Justice, concur.

SABERS, J., concurs in result in part and dissents in part.

KEAN, Circuit Judge, for WUEST, J., disqualified.

KONENKAMP, J., not having been a member of the Court at the time this action was submitted did not participate.

SABERS, Justice (concurring in result in part and dissenting in part).

I concur in result on both issues but dissent on defamation.

When considering a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Wilson v. Great N. Ry. Co.*, 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968). All doubts are to be resolved in favor of the nonmoving party. *Id.* Summary judgment is an extreme remedy not appropriate for disposing of factual issues or as a substitute for trial. *Koeniguer v. Eckrich*, 422 N.W.2d 600, 601 (S.D.1988).

By dismissing the defamation claim, the trial court usurped the function of the jury. Rather than viewing the evidence in the light most favorable to the non-moving party as required under a summary judgment motion,

see *Wilson*, 83 S.D. at 212, 157 N.W.2d at 21, the trial court erroneously determined the merits of the defamation claim. A genuine issue of material fact was presented because people knew of the incident the next day. They were pointing at Howe calling her names that questioned her chastity. Obviously, these people heard about these incidents from sources originating with Reiman. Reiman was the likely source of some of these rumors.[1] The falsity of those rumors, that Howe was walking around nude, voluntarily engaging others in touching her and that she had been penetrated digitally, presents genuine issues of material fact.

At his deposition, Reiman admitted that he made false statements about Howe to others. He *admitted* the publication of these falsehoods. When asked why he made these misstatements, he said because he was afraid.[2] Reiman Deposition at 13. The trial court's ruling states that the "emotional distress [Howe] suffered was as a result of the rampant rumors that started to circulate...." Trial Court's Ruling, at 3. The question of the source and veracity of those rumors should be presented to the jury. The burden is on defendant to show that there are no genuine issues of material fact. *Dept. of Rev. v. Thiewes*, 448 N.W.2d 1, 2–3 (S.D. 1989). Defendant has failed to meet his burden in this respect.

This matter is filled with factual matters and disputes. Only the jury can resolve factual disputes such as this.

This matter has been tragic and embarrassing for all of these families involved. I sense a strong temptation on the part of the

---

1. Another boy at the high school testified that he had heard that Howe had been penetrated digitally at the Mansion that night:

> Q. Did anybody directly tell you that they had [penetrated her digitally] that night?
> A. Nobody directly told me.
> Q. Who did you hear did?
> A. I don't remember any names, I just remember that it happened up there and that Toni was the victim.

Deposition of Cody Allen Asher, at 13.

Reiman told this exact story to police, later admitting that it was false. Deposition of Reiman, at 13. He was the likely source of this false rumor that circulated around the high school. Reiman's admitted publication of the false rumor

to law enforcement is sufficient for defamation. A genuine factual issue of the source of that rumor has been presented by Howe and the defamation claim should survive summary judgment. *Koeniguer*, 422 N.W.2d at 601.

2. Reiman testified as follows:

> Q. Did you ever tell anybody that [he] had [digitally penetrated] her?
> A. Yes, I did.
> Q. Why did you say that to anybody?
> A. Because I was very scared at the time.
> Q. And in fact did [he] ever tell you that he [digitally penetrated] her?
> A. No, he did not.

Deposition of Reiman at 13.

court to end it as soon as possible by any available means—even the wrongful denial of a jury trial. But the end never justifies the means.

The grant of summary judgment may seem to be a good thing on the defamation count, but it would deny plaintiff the right to a jury trial. It would be a sad day for South Dakota if the final chapter is the denial of the Constitutional right to a jury trial.

I know this is a difficult thing for the families involved, but it cannot be swept under the rug. It will come to rest properly only after a jury trial.

The Constitution guarantees the right to a jury trial—the trial court denied it.

The Constitution guarantees that courts shall remain open—the trial court closed it.

We should reverse and remand for a fair trial on *all* issues.